WILSON et al. v. CHICAGO LUMBER & TIMBER CO. et al.

(Circuit Court of Appeals, Eighth Circuit. February 26, 1906.)

No. 2,145.

1. APPEAL AND ERROR—DISMISSAL—INFORMALITY IN PRODUCTION OF EXHIBITS.

Where, at the argument and submission of a case in the appellate court, exhibits used in the trial court are referred to and treated by both parties as properly before the court, any informality in the manner in which they were brought into court is waived, and is not ground for dismissal of the writ of error.

[Ed. Note.—For cases in point, see vol. 3, Cent. Dig. Appeal and Error, § 3133.]

2. BOUNDARIES—CONFLICTING ELEMENTS—CONTROL—REFERENCE TO MAP.

In a deed to a tract of land in the townsite of Denver, Colo., executed in 1872 by the probate judge, who held the title of the townsite in trust for the occupants, under acts of Congress, to be conveyed to those entitled thereto under regulations prescribed by the Legislature of the territory, the boundaries given were as follows: "Beginning at a point on the west line of F street in the East division of the city of Denver, in said county and territory 106 feet northerly from the Northwest corner of F street and Williams street; thence on the west line of F street 144 feet; thence at right angles with F street westerly to the east line of the old bed of the South Platte river, as the same is marked and defined on the map of said city as per survey of F. J. Ebert; thence southerly along the east line of the old bed of the South Platte river 62 feet; thence in a direct line southerly and parallel with F street to a point 106 feet northerly from Williams street and 125 feet westerly from the westerly line of F street; thence at right angles and in a direct line easterly 125 feet to F street, the place of beginning." At this time, as well as when the map referred to was made, the lines of the old river bed had been obliterated by floods and could not be located on the ground with certainty, but they were shown on the Ebert map, which was drawn to a stated scale and was of record, and according to such map the east line was some 350 feet west of F street. Other deeds under which defendants claimed, made about the same time, conveyed adjoining tracts and the river bed itself, and all referred to said map as showing its location. Plaintiffs claimed under the deed set out. *Held*, that the map must be regarded as an artificial monument adopted by the parties to the original conveyances as a final and conclusive reference for the location of the east line of the old river bed, and in the deed set out controlled the call for the distance of 125 feet for the last course, which must be rejected as an error.

3. SAME—CONSTRUCTION.

Where in a deed a recorded map is referred to as monument fixing a boundary, the addition of the words "as per survey of" a person named must be construed only as intended to identify the map, and they do not render the map impeachable by the field notes of the survey.

4. PUBLIC LANDS—TOWNSITE ENTRY—PROBATE JUDGE—JUDGMENT—VALIDITY AND EFFECT—DEPARTURE FROM PLEADING.

Where a probate judge, in whom title to a townsite was vested by law in trust for the benefit of the several occupants of the land, was authorized by statute to determine summarily, on a petition filed before him, the right of any occupant to land claimed by him and to execute a conveyance therefor, his decision to be final and conclusive, unless a rehearing was obtained, the validity and effect of a decision and conveyance made by him thereunder are not affected by the fact that the extent or boundaries of the tract conveyed are not the same as those claimed in the petition, whether the quantity be more or less.

143 F.—45

In Error to the Circuit Court of the United States for the District of Colorado.

For opinion below, see 129 Fed. 636.

This was an action in ejectment brought by Wilson and others, as plaintiffs, against the Colorado & Southern Railway Company and its lessee, the Chicago Lumber & Timber Company, to recover possession of a certain tract of land in the city of Denver, the eastern boundary line of which is 150 feet west from and parallel with F or Fifteenth street, extending thence with a uniform width of 173 feet westerly to the east line of the old bed of the South Platte river, as marked and defined on the map of the city of Denver, as per survey of F. J. Ebert.

By an act of Congress approved May 23, 1844, c. 17, 5 Stat. 657, as extended by an act approved May 28, 1864 (c. 99, 13 Stat. 94), the legal title of section 33 and the west half of section 34 in township 3, range 68 west, was vested in the probate judge of Arapahoe county "in trust for the several use and benefit of the rightful occupants of said land and the bona fide owners of the improvements thereon according to their rightful interests." He was to be governed in the disposal of the same by rules and regulations to be laid down by the legislative authority of the state, then territory, of Colorado.

By the provisions of section 3 of the Act of February 8, 1872 (Laws Colo. 1872, p. 192), any person claiming a beneficial interest in the land was required to file his petition in writing before the judge, setting forth facts disclosing his interest in the land claimed by him. Whereupon it became the duty of the judge to set the petition down for hearing, and upon such hearing, if the result proved favorable to the petitioner, to execute and deliver a deed conveying to him the fee simple title to such land. The result of the hearing is made conclusive upon the city of Denver and all parties.

Polinah Truax claimed a certain portion of this land, and on September 7, 1872, filed her petition with the judge to procure a deed thereto. She claimed land described as follows: "Beginning at a point 65 feet from the northwest corner of F and Williams street; thence along the west side of F street to Bassett street 185 feet; thence westerly at right angles with F street 125 feet; thence southerly on a line parallel with F street 185 feet; thence easterly 125 feet to the place of beginning." Her petition was heard on the evidence adduced, and on September 17, 1872, an order was made reciting the filing of the petition, the hearing thereon, the finding that she had acquired an interest in a portion of the land described in her petition, and adjudging that she receive a deed therefor. The land described in the order is as follows: "Beginning at a point on the west line of F street in the East division of the city of Denver, in said county and territory, 106 feet northerly from the northwest corner of F street and Williams street; thence on the west line of F street 144 feet; thence at right angles with F street westerly to the east line of the old bed of the South Platte river as the same is marked and defined on the map of said city as per survey of F. J. Ebert; thence southerly along the east line of the old bed of the South Platte river 62 feet; thence in a direct line southerly and parallel with F street to a point 106 feet northerly from Williams street and 125 feet westerly from the westerly line of F street; thence at right angles and in a direct line easterly 125 feet to F street, the place of beginning."

A deed was duly executed bearing date September 17, 1872, conveying the land as last described, to her.

On January 3, 1873, the probate judge, acting by the same authority, conveyed to James Tynon the following described land: "Commencing at a point on the westerly line of F street 100 feet northerly from the northwest corner of F and Williams streets; thence westerly to the old bed [referring here to a former description where the old bed is described as 'the old bed of the South Platte river according to the map and survey of said city by F. J. Ebert'] of the South Platte river; thence northerly down the east line of the old bed of the South Platte river to a point where a line drawn westerly from a point on the westerly line of F street 187 feet northerly from

the northwest corner of F and Williams streets, would intersect the said east line of the old bed of the South Platte river; thence in a direct line southerly 87 feet to a point 106 feet northerly from Williams street and 125 feet westerly from F street; thence at right angles to said last line 125 feet easterly to F street; thence 6 feet southerly to the place of beginning. Also that piece of land described as follows, to wit: Commencing at a point on F street 250 feet northerly from the northwest corner of F and Williams streets; thence westerly to east line of the old bed of the South Platte river; thence northerly down the east line of the old bed of the South Platte river 23 feet; thence at right angles easterly to F street; thence 23 feet southerly to the place of beginning."

Tynon, by deed dated January 8, 1873, conveyed the same to Polinah Truax.

The three parcels of land, above described, by mesne conveyances afterward became vested in Robert Potter. He died, leaving five children. Three of his children, who are the plaintiffs, acquired the right and title of the other two.

Defendants deny plaintiffs' title and right of possession, set up title in themselves and plead the statute of limitation. They rely for title upon two deeds; one from James Tynon to John P. Heisler, dated July 10, 1882, whereby, as a part of a larger tract, Tynon conveyed to Heisler the western portions of the two tracts acquired by him from the probate judge, being all thereof west of a line drawn 150 feet west of and parallel with F street, extending back to the east line of the old bed of the South Platte river; the other from the probate judge to James McNasser, dated October 23, 1872, conveying the following described lands: "The whole of the old bed of the South Platte river as the same is marked and defined on the map of the said city of Denver as per survey of F. J. Ebert, and lying and being in said city of Denver," etc.

The record shows that by mesne conveyances the rights so acquired by Heisler and McNasser were vested in the defendant the Colorado & Southern Railway Company. The case was tried without a jury, and a general finding made in favor of the defendants. The case is brought here by plaintiffs to correct alleged errors committed by the trial court in admission of evidence and in rendering judgment for defendants without substantial evidence to support it.

R. H. Gilmore (John D. Fleming, on the brief), for plaintiffs in error.

E. E. Whitted (Tyson S. Dines and O. L. Dines, on the brief), for defendants in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge, after stating the case as above, delivered the opinion of the court.

After the argument and submission of this cause on the merits, defendants in error filed a motion to dismiss the writ of error for the reason that certain maps and exhibits used at the trial were not incorporated in the record. We find, on examining the record, briefs of counsel, and exhibits filed with this motion, that some of the large and cumbersome original maps and exhibits, the absence of which furnished the occasion for the present motion, were, by an order of the trial court made by consent of both parties, sent to this court for use in the argument, without incorporation in the bill of exceptions. For reasons unnecessary now to state they failed to arrive until after the oral argument, but have since arrived and have been sufficiently examined and considered. Copies of other exhibits were presented to the court in the argument and briefs by both parties, and no objection

was made to the use or consideration of such copies. The argument and submission proceeded as if all exhibits were properly before us. We think, by the course of procedure, that counsel for both parties waived all objections to the informal way in which these exhibits were called to our attention. It would be manifestly unfair to sustain this motion. Such action would necessarily deprive plaintiffs in error of the opportunity which they would have had, if the motion had been seasonably made, to secure, by certiorari or otherwise, the perfection of the record. Moreover, we are satisfied that the record, as it is, and the exhibits which counsel on both sides have treated as properly before us, enable us to pass upon all the questions presented for our consideration. The motion to dismiss will therefore be denied.

A consideration of the force and effect of the "Ebert map," referred to in the descriptions of the several deeds, will first be had, because the solution of many questions raised by the assignment of errors depends upon their determination. That map purports to be the result of a survey made by F. J. Ebert, of section 33 and west half of section 34, which was the land committed in trust to the probate judge by the act of May 28, 1864, supra. The original map was filed in the recorder's office of Arapahoe county, May 29, 1865, and copies thereof were incorporated in the plat books of the office. A blue print taken from an accurate tracing of the original map, which has been used for the purposes of this hearing, discloses the platting of the land into streets, alleys, lots, and blocks, with a distinct location and delineation of the course of the old bed of the South Platte river on the map itself. This appears to indicate a general northern and southern course for the river and that it ran past the lot in dispute on the westward. The width of avenues and lots shown on the map is generally specified thereon, but the distance of the "old bed," Cherry creek and South Platte river, from avenues or lots is not stated. The scale of the map, 250 feet to the inch, is stated on its face, and this, by practical tests made in the measurement of distances marked on the map, is found to be substantially accurate and reliable. The map therefore was doubtless intended to, and does, disclose not only the location of the old bed, but its accurate relationship to the land in its vicinity.

It is apparent from the evidence that the true location of the "old bed" in 1872 was a matter resting in much doubt. Some of defendants' witnesses locate it from 120 to 150 feet west of F street. This would fix the western boundary of the Truax lot some 200 feet east of the east line of the old bed as it appears to be marked on the map. It is said that the field notes of the Ebert survey located it generally east of F street, making it cross Williams street and F street within 20 or 30 feet respectively from the corner of those streets, and to run, thence in a northeasterly direction past the lot in controversy, altogether on the east thereof.

The learned trial judge, who speaks not only in the light of the proof, but from a long personal acquaintance with that locality, says:

"When the Ebert map was made in 1865, the line of this channel was not visible at the point in dispute. It had been obliterated by the flood which took place in Cherry creek and in Plum creek in the month of May, 1864, so that the actual location of the channel and the east line of the old bed of the

South Platte river in the year 1865 must have been difficult, if not impracticable to locate."

From these facts the desirability of some fixed and permanent location of the old bed as it originally existed is apparent. A map was made, lodged, and filed in the office devoted to preserving records of land titles. This map definitely pointed out the old bed by name, and furnished data on its face, in the adopted scale of 250 feet to the inch, for determining its width, distance from and relationship to streets, alleys, and lots platted on the map.

The probate judge heard the petition of Polinah Truax, awarded the judgment, and made the deed in the light of the foregoing facts.

He knew of the Ebert map and made use of it in describing the lands awarded to her. Both in the judgment and deed he limits the running of the second or westerly course by "the east line of the old bed of the South Platte river, not as it exists on the face of the earth, but as the same "is marked and defined on the map of the city as per survey of F. J. Ebert." The third and southerly course is "along the east line of the old bed of the South Platte river 62 feet." This, from its context, obviously refers to the same east line as was referred to in the second course, namely, as "marked and defined" on the Ebert map.

The next or fourth course is "in a direct line southerly to a point 106 feet northerly from the north line of Williams street; thence (with an omission of a call presently to be noticed) at right angles to the said last line (with another omission here) to the west line of F street, the place of beginning."

Without now heeding the omissions referred to, little doubt, if any, could be entertained concerning what the probate judge intended to convey. A complete and harmonious description would seem to have been made.

The omitted calls locate the point mentioned as 106 feet north of Williams street to be "125 feet west of F street," and also state, what necessarily follows, that the distance from this point to F street is 125 feet. These omitted calls, it is observed, deal only with the distance of the last course, to the place of beginning. Given the starting and ending points, a straight line between them could of course be readily traced without information as to the distance between them. The point referred to as 106 feet from Williams street is the limit of a course from which the next course runs at right angles and ends at the place of beginning.

On the theory that the east line of the old bed as marked and defined on the Ebert map is its western boundary, the Truax deed conveys practically a parallelogram of land, having a front of 144 feet on the west side of F street and running back with somewhat varying side measurements to the old bed. The other two tracts, conveyed by the deed of the probate judge to James Tynon, flank the Truax lot on the north and south sides. They are described in the statement preceding this opinion, and no further accurate reference need be made to them. They constitute, with the Truax purchase, a body of land fronting 173 feet on F street and extending back with like width to the old bed. The description of these remaining two tracts calls

for the east line of the old bed "according to the map and survey of said city, by F. J. Ebert," substantially as the Truax deed does, as the end of one course, and runs an important course along that line; but the description of the first tract contains the supposed infirmity found in the Truax deed, namely, a statement that the point fixed as 106 feet north of Williams street is 125 feet west of F street.

In the view we take of plaintiff's title, we do not find it necessary to consider the contention of plaintiffs' counsel that defendants are estopped from denying the correctness of the Ebert map or its availability as a monument of title, by the descriptions in the deeds which their remote grantors took from the probate judge, and which their successive grantors have employed in conveying to them. Nevertheless a short reference may appropriately and instructively be made to them.

The first deed relied on by defendants is that of James Tynon to John P. Heisler, dated July 10, 1882. This is a quitclaim deed. He had, before making this deed, conveyed the property by him acquired from the probate judge, to Mrs. Truax by exactly the same description as that employed in the conveyance to him. At the time he made the quitclaim deed he had no title to convey. This last mentioned deed was undoubtedly secured after new light had appeared to defendants' grantors. It called for the "old bed," but not as marked and defined on the Ebert map. This quitclaim deed amounts to color of title only, and was doubtless secured and is now utilized by defendants as the initiation of the right of possession which they claim confers upon them title by virtue of the statutes of limitation, which will be later considered. The deed under which defendants claim title, as distinguished from possession, is that of the probate judge to James McNasser. The property conveyed by this deed is "the whole of the old bed of the South Platte river as the same is marked and defined on the map of the said city of Denver as per survey of F. J. Ebert."

By mesne conveyances consisting of six different deeds from successive owners, this McNasser title is finally lodged in John P. Heisler, the grantee in the quitclaim deed of July 10, 1882, from James Tynon. In every one of these six deeds the description was practically the same as in the original deed from the probate judge. No description is made of the granted premises except by references to the Ebert map. "The whole of the old bed * * * as marked and defined" on that map was conveyed, and nothing else. Without the map the subject of the grant could not be identified. McNasser accepted a conveyance from the probate judge with this description, and the successive grantees, including Heisler, in 1882, accepted the conveyance by the same description, except that at the end in the final conveyance from Woodbury to Heisler the description of the premises conveyed makes no reference to the survey of Ebert, but was simply this: "The whole of the old bed of the South Platte river as per said map of F. J. Ebert."

It thus appears that all the parties, with whom the plaintiffs and defendants are privies, in the transactions with reference to the title in dispute, for about nine years recognized the Ebert map as controlling of their rights and interests in the land in question.

The deeds under which defendants, as well as those under which plaintiffs, claim title, clearly recognize the east line of the old bed as marked on the Ebert map as plaintiffs' western boundary and the same line as defendants' eastern boundary of their respective possessions. If the distance call of 125 feet from F street as found in the deeds in question is correct, then all the other calls found in the descriptions (if the location of the old bed of the South Platte river as marked and defined on the map is a fixed and controlling monument) are wrong. If all the others are right, this distance call must be wrong. Courses and distances, by a familiar rule of law, must yield to monuments. Accordingly, this distance call of 125 feet, if the Ebert map is a monument, must be rejected as a patent and palpable mistake.

What is the Ebert map? As already observed, it was born of the uncertainty of the location in question occasioned by recent floods and consequent different opinions touching a former well-known landmark. It was filed and recorded in the recorder's office and was known to and recognized by the probate judge. He frequently referred to it in the Truax and other deeds executed at about the same time.

In Coles v. Yorks, 36 Minn. 388, 31 N. W. 353, the Supreme Court of Minnesota, considering a question of surveying, says:

"When there is a description by courses and distances, and another by reference to known monuments, the latter prevails; and a map or plan referred to (certainly if a public record) stands upon the same footing as a monument."

In Nicolin v. Schneiderhan, 37 Minn. 63, 33 N. W. 33, the Supreme Court of that state, in a case involving a recorded plat as part of a description of a grant, observes that there are "two very familiar and well-established principles in the construction of conveyances: * * * First, where a map or plat is referred to in a conveyance, it becomes for the purpose of the description and identification of the land, a part of the deed," and, "second, courses and distances must yield to monuments, visible objects, or natural boundaries called for in the deed." In that case, Mitchell, Judge, speaking for the court, says that the plat, according to which plaintiffs conveyed and to which his deeds referred, "makes Sand creek the south boundary as distinctly as it makes Water street the north boundary of lot 1. It represents the east and west lines of the lot as extending from the street to the creek." That language, mutatis mutandis, might well apply to the case before us. The probate judge makes the east line of the old bed of the South Platte river, as marked and defined on the Ebert map, the western boundary of the land conveyed by the Truax deed as distinctly as he makes F street the eastern boundary thereof.

In Vance v. Fore, 24 Cal. 436, a case was under consideration involving the construction of a deed in which the boundaries are described as "on a certain map thereof made by Thos. M. Swan." The court says:

"There is a discrepancy or conflict between the verbal discription by courses and distances and the description furnished by the map. * * * We

consider that the map constituting a part of the deed now in question * * * is more stable and certain, and less likely to be affected with mistakes, than the other description by courses and distances contained in the deed. In effect, the map makes the deed a conveyance by monuments."

In Chapman v. Polack, 70 Cal. 487, 495, 11 Pac. 764, 768, the Supreme Court of California lays down the rule in the following language:

"Where a map or plan of a tract of land, with lines drawn upon it marking the boundaries, and with the natural objects upon its surface laid down, is referred to in a deed containing a description of the premises therein conveyed, this map or plan is to be regarded as giving the true description of the land conveyed, as much as if it was expressly recited and marked down in the deed itself."

The court held in that case that the line as designated upon the plat so referred to in the deed, whether accurate or not, is conclusive of the rights of the parties bounding upon it.

In Jones v. Johnston, 18 How. 150, 15 L. Ed. 320, the owners of two lots of ground, numbered, respectively, 34 and 35, had acquired title from the same source. The deeds to each referred to the town plat as recorded in the office of the recorder of Cook county. A mistake was made in recording that plat. By reason of the mistake, evidence was introduced concerning the original plat, and consideration was given to it by the court in its charge to the jury. The Supreme Court, in disposing of the case, makes use of the following language:

· "The case was a good deal embarrassed on the trial, arising out of the evidence in respect to this original plat. * * * We think the court erred in admitting it as evidence to control, or in any way to affect, the recorded plat. Both lots in controversy were conveyed with express reference to that, and without such reference there is not a sufficient description given in the deeds of the boundaries to admit of a location of either. If there was in fact any error or mistake in this reference, by way of description of the premises conveyed, the remedy was in chancery to reform the deed. So long as that remained unreformed, the description of the lot by reference to the recorded plat was conclusive upon the parties."

To the same effect are the following cases: Denver v. Clements, 3 Colo. 472, 481; Davis v. Rainsford, 17 Mass. 207; Magoun v. Lapham, 21 Pick. (Mass.) 135; Prop'rs Kennebec Purchase v. Tiffany, 1 Me. 219, 223, 10 Am. Dec. 60; Lunt v. Holland, 14 Mass. 149; Shufeldt v. Spaulding, 37 Wis. 662; Fox v. Union Sugar Refinery, 109 Mass. 292; Jefferies v. East Omaha Land Co., 134 U. S. 178, 194, 10 Sup. Ct. 518, 33 L. Ed. 872.

In the light of these authorities we are of opinion that the Ebert map must, for the purposes of this case, be regarded as an artificial monument adopted by the parties to the original conveyances in question as a final and conclusive reference for the location of the east line of the old bed of the South Platte river.

Defendants' counsel call attention to the fact that the descriptions employed in the deeds from the probate judge, referring to the "old bed as marked and defined on the map," are qualified by the words "as per survey of F. J. Ebert," and contend that such qualification necessarily incorporates the field notes of the survey into the description. Evidence was introduced tending to show that the field notes located the "old bed" as crossing Williams street and F street

near their corner and running northwardly east of F street. Evidence was also introduced by defendants, over plaintiffs' objection, tending to show that the old bed actually ran in a general northerly direction about 125 to 150 feet west of F street. The admission of this evidence is assigned for error.

The evidence offered to show what was disclosed by the field notes in question consisted of a copy of an unauthenticated or supposed copy thereof. Technically, for this reason, it should have been excluded; but we desire to place our reasons for excluding it on a more substantial basis. The words relied upon by counsel for defendant "as per survey of F. J. Ebert" were, in our opinion, not intended to incorporate the survey as made, or the field notes from which the map was drawn, in the reference, or to include them together with the map as a part of the deed. As already observed, the uncertainty as to the true location of the "old bed" in 1865 probably induced the adoption of the map as a fixed artificial monument of reference in the conveyance in question. To adopt defendants' view would interject doubt and uncertainty in the place of that certainty which the map itself was obviously intended to afford. We think the proper and natural office intended by the words in question, considered in the light of their context, was to more specifically designate the particular map of the city to which reference was made. There appears to have been other maps of Denver; one certainly, known as Boyd's map. That map was not referred to in the deeds in question; but on the contrary, the map made by (or what is the equivalent, after the survey of) Ebert was so referred to. The cases cited by defendants' counsel, as authority for the proposition that the field notes must be treated as incorporated in the Truax and other deeds, have been carefully examined and considered. They are found, upon examination, to relate to descriptions in deeds involving a general reference to a "map and survey." As heretofore pointed out, the case before us is not of that kind. The reference in the Truax deed is not to Ebert's map and survey generally speaking, but to the old bed or east line of the old bed as marked and defined on Ebert's map. This is essentially different and more accurate than the general reference to both map and survey as is found in the cases relied on by defendants' counsel. For these reasons we conclude that the trial court erred in admitting the field notes in evidence.

The evidence offered and received concerning the true location of the "old bed" as it existed on the face of the earth was also, in our opinion, erroneously received.

The deeds upon which plaintiffs rely for title do not describe the land as bounded by the "old bed," but by the "old bed" as marked and defined on Ebert's map. The evidence so offered and received introduced the uncertainty which the parties to the original deeds sought to and did avoid. The trial court admitted in evidence, over plaintiffs' objection, the petition of Polinah Truax preferred to the probate judge in September, 1872, wherein she described the land in which she claimed to be interested and to which she desired a deed, as containing a front of 185 feet on F street by a depth westwardly of 125 feet.

The acts of Congress of 1844 and 1864, supra, vested title to the land in question originally in the probate judge, as trustee, for the benefit of those interested in it; and the act of the Legislature of Colorado in 1872, supra, empowered the probate judge, whenever a petition was filed before him by any person for any portion of the trust property, to find the facts and determine the validity of the claim and "to execute and deliver to such petitioner or petitioners a deed or deeds granting and conveying to him, her, or them, the fee simple title to any such lot or lands." By the provisions of the act his finding was "final and conclusive," unless he should award a new trial. The act seems to have provided for a summary proceeding on the part of the probate judge. The proceeding was instituted by a petition, contemplates notice thereof to the city attorney of the city of Denver, and provides, without any further pleadings, for a finding of facts, judgment, and execution of the judgment by the making and delivery of deeds corresponding thereto. Such was the proceeding had in the case under consideration. The judgment recited the filing of the petition; the finding that Mrs. Truax was not entitled to 185 feet of ground fronting on F street, but only to 144 feet of such frontage, but was entitled to extend westerly from F street not only the distance of 125 feet, as petitioned for, but to the eastern line of the old bed of the South Platte river, as marked and defined on the Ebert map. The deed was made according to this finding and judgment. In other words, the judge found that she had a meritorious claim to a lot of less frontage, but greater depth, than she had petitioned for.

All experienced lawyers know how common it is for judgments and decrees, even in courts where proceedings are statutory and formal, to depart in many particulars from the prayers of the original petitions. Statutes providing for amendments, formal and substantive, and statutes of jeofail are enacted to meet such emergencies. The probate judge, in administering the trust in question, was not governed by a Code of Procedure. He was, in a large sense, a law unto himself, so far as the practice before him was concerned. Non constat that there may not have been an amended petition filed or an oral modification of the original petition permitted.

However these things may be, and they are alluded to for the purpose of showing how unsafe and unreliable are the inferences attempted to be drawn from the facts stated in the original petition, we see no reason for departing from the accepted general rule that the judgment as rendered must be definite and final. 1 Freeman on Judgments, § 2; Eppright v. Kauffman, 90 Mo. 25, 1 S. W. 736. This rule is applicable whether the bodies authorized to investigate and determine questions are the established courts of the land or special tribunals designated for a particular purpose. 2 Freeman on Judgments, § 531 and cases cited. There is no latent ambiguity in the judgment which could be explained by reference to the original petition. We have found that by principles of law well recognized and applied in conveyancing the only irreconcilable call mentioned in the judgment or in the Truax deed is a distance call of 125 feet, and that this is a patent mistake and one which, when ignored, leaves a perfect and

harmonious description.   Ordinarily, when a judgment is offered in evidence, the pleadings on which it was rendered are admissible in connection with it to determine its true import.   There was therefore no error in receiving the petition of Mrs. Truax, but its evidential force, for reasons already stated, was insufficient to modify the description of the land contained in the judgment and deed which followed.   The judgment was the ultimate and clear expression by the probate judge of the extent and description of the land to which Mrs. Truax was entitled.

Because it appears that the learned trial judge did not treat the Ebert map as a monument of title, but entertained evidence concerning the true location of the old bed on the face of the earth and other evidence touching the intent of the probate judge in making the original grant, he reached a conclusion adverse to the plaintiffs in this case. This conclusion, although in our opinion incorrect, cannot be disturbed, if other phases of the record disclose that plaintiffs have no title or right of possession to the land in controversy.

This brings us to a consideration of defendants' contention that plaintiffs' claims are barred by the statutes of limitation.

Defendants first invoke the General Statute of Colorado requiring actions for the recovery of lands to be commenced within 20 years after the right to bring the same accrues.   3 Mill's Ann. St. Rev. Supp. § 2923.   Defendants' possession, according to the averments of their answer, was taken under the Tynon deed, dated July 10, 1882, and certainly not till then did the right of plaintiffs to bring an action against defendants or their grantors accrue.   This suit was instituted within 20 years thereafter and was not barred by that statute.

Defendants next claim that, under the provisions of the same section (prior to its amendment), they or their successive grantors had been in the peaceable and undisturbed possession of the land in controversy for a period of five consecutive years, and had, during that period, paid all taxes legally assessed against the land and had thereby acquired title to the same.   In substantiating this defense the burden was cast upon defendants to establish two facts:   First, that they or their grantors had been, for a period of five consecutive years, in the peaceable and undisturbed possession of the land in question; and, second, that they had during that period paid all taxes legally assessed against the land.   Neither of these facts, in our opinion, sufficiently appear from the proof to justify a verdict or finding for defendants.   There is much controversy and doubt  concerning what land is included in many of the tax receipts offered in evidence, and as to which party paid the taxes for given years.   In some years, defendants or their grantors, in the hope, doubtless, of retrieving a lost position, paid taxes a second time after plaintiffs had already done so.   In other years the lands were sold for nonpayment of taxes according to law, and afterwards redeemed by defendants.   These redemption certificates were offered in evidence, but excluded by the court.   The years represented by them therefore cannot be considered in computing the five years in question.   The tax limitation act of Colorado was borrowed from the state of Illinois.   Prior thereto, the Supreme Court of the parent state had held that the first payment of taxes on any lot of

ground discharged both the land and the owner from liability therefor, and that any second or subsequent payment was unavailing as evidence of a continuous payment, within the meaning of the tax limitation law. Morrison v. Kelly, 22 Ill. 610, 626, 74 Am. Dec. 169; Ross v. Coat, 58 Ill. 53.

Defendants again claim that they were in possession of the land in controversy and paid taxes thereon for seven consecutive years, as provided by the amendatory act of April 8, 1893 (Sess. Laws Colo. 1893, p. 327, c. 118), and thereby acquired title thereto. Whatever taxes defendants paid, available to them as a defense under this last-mentioned act, must have been paid after 1893. On June 7, 1893, plaintiffs paid all the taxes due that year, and, without mentioning the evidence as to payment of taxes in the intervening years, it appears that plaintiffs paid them for the year 1899. This disposes of defendants claim of title under the act of 1893.

The conclusions reached on the several questions considered dispose of the assignment of errors without more specific reference to them.

It results that the judgment must be reversed, and the cause remanded with directions to grant a new trial.