**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 10, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

C. MARK CUPPS; MARK B. KOENIG;
CHERYL L. KOENIG; DALE M.
CARLSON; PEGGY CARLSON; JOHN
E. MCINROY; ANN W. PECK; PHILLIP
KOSKI; ANDREA KOSKI; ESTHER
SANDOVAL; KAY YUEN HING
REVOCABLE TRUST; FLOYD A.
BARBOUR; WILLIAM G. CUTLER;
BRUCE R. SMITH; DEBRA J. SMITH;
JOSEPH RUPINKSKI, JR.; LARRY
WEYHRICH; KATHY WEYHRICH;
LARAMIE BOAT CLUB, INC.;
BARBARA J. BARBOUR,

     Plaintiffs - Appellants,

v.

PIONEER CANAL-LAKE HATTIE
IRRIGATION DISTRICT,

    Defendant - Appellee.

No. 18-8024
(D.C. No. 2:16-CV-00086-SWS)
(D. Wyo.)

_____

**ORDER**
_____

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, **LUCERO**, **HARTZ**, **HOLMES**,
**MATHESON**, **BACHARACH**, **McHUGH**, **MORITZ**, **EID**, and **CARSON**, Circuit
Judges.[*]

_____

[*] The Honorable Gregory A. Phillips is recused and did not participate in the
consideration of the Petition.

This matter is before the court on Appellee's *Petition for En Banc Consideration/Panel Rehearing* ("Petition"). We also have a response from Appellants.

Pursuant to Fed. R. App. P. 40, the request for panel rehearing is denied by a majority of the original panel members.[**]

The Petition and response were circulated to all non-recused judges of the court who are in regular active service, and a poll was called. A majority of the participating judges voted to deny the Petition. *See* Fed. R. App. P. 35(a). Consequently, Appellee's request for en banc rehearing is also denied.

Chief Judge Tymkovich, and Judges Lucero, Hartz, Eid, and Carson voted to grant en banc rehearing. Judge Carson has filed a separate dissent from the denial of en banc rehearing. Judge Carson's dissent is joined by Chief Judge Tymkovich and Judges Lucero, Hartz, and Eid.

Entered for the Court

CHRISTOPHER M. WOLPERT, Clerk

---

[**] The late Honorable Monroe G. McKay participated in this appeal originally but passed away on March 28, 2020. He did not, therefore, participate in consideration of the request for panel rehearing that is resolved in this order. "The practice of this Court permits the remaining two panel judges if in agreement to act as a quorum in resolving the appeal." *United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir.1997); *see also* 28 U.S.C. § 46(d) (noting circuit court may adopt procedures permitting disposition of an appeal where remaining quorum of panel agrees on the disposition). The remaining panel members have acted as a quorum in agreement with respect to the request for panel rehearing.

*18-8024, Cupps v. Pioneer Canal-Lake*

**CARSON**, Circuit Judge, joined by **TYMKOVICH**, C.J., and **LUCERO**, **HARTZ** and **EID**, dissenting from the denial of rehearing *en banc*.

*Water is life, and its absence is death.*

Today, a bare majority of this Court votes to deny *en banc* rehearing of a panel decision that could single handedly dry up thousands of acres of irrigated Wyoming farmland. In reaching its decision, the panel fundamentally misinterpreted the Irrigation Act of 1891 and ignored well-established federal riparian doctrines. For these reasons and because this case involves issues of paramount importance that deserve consideration by the full court, I respectfully dissent from the Court's order denying *en banc* review.

I

In its efforts to settle the American West, the United States government faced an inconvenient truth: most of the land was arid and not suitable for dry land agriculture. Congress sought to alleviate this problem through laws encouraging the development of projects that could capture water for irrigation and stock-raising. One such law was the Irrigation Act of 1891 (the "1891 Act"), which Congress enacted to encourage the irrigation, settlement, and economic growth of the American West. See, e.g., Chicala Water Co. v. Lytle Creek Light and Power Co., 26 L.D. 520, 524 (1898). This lawsuit involves Lake Hattie Reservoir—an 1891 Act project developed by Appellees' predecessors to capture water for irrigating lands downstream. Lake Hattie's surface area exceeds four square miles and by some measures supports the irrigation of more than

28,000 acres of farmland, not to mention the stock water it provides to downstream ranchers.

Some forty years after Lake Hattie's development and in an apparent effort to expand recreational opportunities, the United States government platted, leased and later sold "lakefront" lots adjoining Lake Hattie. The United States government issued patents to Appellants' predecessors that were expressly subject to "any vested and accrued water rights . . . and rights to any ditches and reservoirs used in connection with such water rights." And as cabin lots changed hands over the years, many owners (including Appellants) received title policies that excluded coverage for damage or loss by reason of: "[a]ny and all instruments of record which relate to what are generally known as the Lake Hattie Irrigation System . . . and any other instruments of record pertaining to ditches, reservoirs, canals . . . ."

Despite these warnings contained in the public record, some cabin owners built their cabins below Lake Hattie's high-water line—a line physically dictated by the height of the reservoir's spillway. Apparently, nobody noticed that some of the cabins were built below the high-water line because for many years the area around Lake Hattie experienced drought and low lake levels. But when sufficient water flowed downriver and filled the lake back to capacity, some of the cabins flooded. Some cabin owners (Appellants in this case) filed suit, arguing that Lake Hattie's boundaries must be permanently restricted to survey lines depicted on a 1909 map of the reservoir.

Following a bench trial, the district court held that because a reservoir can only be managed by controlling the water level, Lake Hattie's boundaries must be set by a

specific elevation level, i.e., by the high-water line of Lake Hattie's dam. The district court rejected Appellants' argument to the contrary as nonsensical because two-dimensional survey lines on a map cannot accurately reflect the ever-changing shoreline boundary of a body of water. Applying well-settled law, the district court reasoned that the survey lines on the 1909 map constituted meander lines rather than fixed, permanent lines.[1] Thus, the district court concluded that the extent of the ground occupied by the water of the reservoir constituted the boundary of the easement.

In an unpublished opinion, a panel of this court reversed the district court's decision. The panel held that the as-drawn survey lines on a 1909 map of the project permanently fixed Lake Hattie's shoreline boundaries.

## II

The 1891 Act grants to "any canal ditch company, irrigation or drainage district" a "right of way through the public lands and reservations of the United States . . . to the extent of the ground occupied by the water of any reservoir and of any canals and laterals and fifty feet on each side of the marginal limits thereof." 43 U.S.C. § 946. But the grant is not self-executing. A canal or ditch company or irrigation district "desiring to secure the benefits" of the Act was required to file with the Secretary of Interior "a map of its canal or ditch and reservoir." 43 U.S.C. § 947. Only upon filing its map could the company receive its easement. And, once the Secretary granted the easement, "all such

---

[1] Meander lines are transitory rather than fixed and change if the waterway changes, such that the watercourse, and not the meander line, is the true boundary. Meander Lines, Black's Law Dictionary (2d ed. 1910).

3

lands over which such rights of way shall pass [were] disposed of subject to such right of way."[2]

In reversing the district court, the panel held that § 947 required that the boundary of the reservoir be strictly defined by the survey lines on the map Appellees' predecessor submitted to the Secretary of Interior for approval. This conclusion, however, is wrong for several reasons. To begin with, recall that § 946 grants the irrigation company a right of way "to the extent of the ground occupied by the water . . . and fifty feet on each side of the marginal limits thereof." The panel's construction effectively eliminates the reach of that section and therefore violates well-established canons of statutory construction by failing to construe the statute as a whole, giving effect to every clause and word. See, e.g., Toomer v. City Cab, 443 F.3d 1191, 1194 (10th Cir. 2006).

I submit the better interpretation, based on the statutory language and relevant authority, is that § 946 defines the scope of the reservoir, while § 947 secures the grant for the company seeking to secure the Act's benefits, even where the "ground occupied by the water" and the map are inconsistent.[3] Consider the Supreme Court's riparian

---

[2] The record supports the conclusion that Appellants own estates subject to the Lake Hattie Reservoir easement. Any contrary suggestion ignores the express reservation in their patents making the cabin lots subject to rights to any ditches and reservoirs.

[3] The survey lines on the map will inevitably conflict with the "ground occupied by the water" because a body of water's shoreline boundary changes over time. Jones v. Johnston, 59 U.S. 150, 155 (1855) (recognizing that "the water-line, though it may gradually and imperceptibly change, is just as fixed a boundary in the eye of the law"). Notably, a 1949 re-survey of Lake Hattie Reservoir revealed that the water line had already moved, as portions of the map's lines were visibly below the present water line of the lake. Yet the panel still holds that a 111-year-old map permanently sets Lake Hattie's shoreline boundaries. The decision defies physics, as well as logic.

4

jurisprudence in place at the time Congress passed the 1891 Act. At that time, maps depicting bodies of water employed transitory "meander" lines "for the purpose of getting [a reservoir's] general contour . . . ." Mitchell v. Smale, 140 U.S. 406, 413 (1891). The use of meander lines as opposed to fixed lines resulted from the difficulty of accurately surveying and mapping "all the various sinuosities of the water line." Id. Therefore, riparian surveys of bodies of water relied on meander lines to capture "an average result" that "shows the general form of the lake." Id.

In other words, by the time Congress passed the 1891 Act, courts had "decided again and again that the meander line is not a boundary, but that the body of water whose margin is meandered is the true boundary." Id. at 414; see also Hardin v. Jordan, 140 U.S. 371, 380 (1891) ("It has frequently been held, both by the federal and state courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the water whose margins are thus meandered, and that the waters themselves constitute the real boundary."). The text and structure of the 1891 Act dovetails with the Supreme Court's riparian jurisprudence and leads to the conclusion that while § 947 required the irrigation company to file a map of the reservoir, the map was intended only as an approximation, as no two-dimensional drawing could accurately reflect "all the various sinuosities of the water line." Mitchell, 140 U.S. at 413.

Similarly, the Department of Interior's own survey manual and administrative rulings reflect that the lines on the map did not define the boundary of the reservoir easement in this case. The Department's 1902 survey rules required that "lands bounded by water are to be meandered at mean high-water mark." [Appellees' App., Vol. VII at

5

64].  The Department also noted only one year after Congress passed it, that the 1891 Act "grants an easement in all the public land a person wishes to flow with water, and then grants him fifty feet all around *the meander line* of his reservoir, or rather, it allows *the meander line* to be run fifty feet outside of the high water line of the reservoir." The Pecos Irrigation and Improvement Co., 15 L.D. 470, 474 (1892) (emphasis added).

The panel dismissed this administrative ruling and the survey rules and justified its holding based on its conclusion that the Department of Interior never approved a map with a specific high-water line.  But given that the Department of Interior reviewed and approved these applications, I find it highly probative that in their own administrative rulings, they treated the survey lines as meander lines and interpreted the Act as extending the boundaries to "the extent of the ground occupied by the water."  It also seems incredibly unfair to hold that the reservoir boundary must strictly conform to the map, when the Secretary of Interior's own survey manual—in use when the reservoir was built—instructed surveyors to "meander" shoreline boundaries.  Considered in context, the administrative rulings and survey manual must be construed as supporting the idea that the reservoir boundary is defined by the extent of the body of water and not the lines drawn on the map.

Moreover, in order to receive approval from the Secretary of Interior, the irrigation company had to demonstrate that state authorities had approved the project.  The district court specifically found that the chief engineer for Lake Hattie Reservoir certified on the face of the map submitted to the Department of Interior that the surveys of the reservoir and canals "represent level lines, which are the proposed water line of the reservoirs."

6

And in the state application for Lake Hattie Reservoir, the engineer included a map containing a high-water elevation of 7,290 feet. Thus, at the time of the grant, the Department of Interior would have necessarily recognized that the map reflected "the extent of the ground occupied by the water" as determined by the high-water line of the reservoir's dam.[4] Thus, I would conclude the district court properly found the Secretary of Interior approved the reservoir based upon a specific high-water elevation.

The panel decision is additionally inconsistent with the manner in which the Supreme Court and this Circuit have decided cases under the strikingly similar Railroad Right of Way Act of 1875. Under the first section of the 1875 Act, a "right of way through the public lands of the United States is granted to any railroad company . . . to the extent of one hundred feet on each side of the central line of said road." 43 U.S.C. § 934. Section four of the 1875 Act states that any railroad company desiring to secure the benefits of the Act "shall . . . file with the officer . . . a profile of its road." 43 U.S.C. § 937.

In a series of cases, various companies constructed railroads in locations different than that shown on the profile submitted to and approved by the Department of Interior. Landowners filed suit against the companies and argued that the grant to the railroad was strictly limited to the lands shown on the profile. This Court and the Supreme Court rejected the landowners' argument and held that the actual location of the railroad

_____

[4] The Bureau of Land Management internally interpreted the easement in favor of the irrigation company as being granted based upon a high-water line of 7,290 feet.

controlled and that the filing of the profile map simply perfected the as-built grant in the railroad company. Jamestown and N. R.R. Co. v. Jones, 177 U.S. 125 (1900) (the scope of the grant depends on actual construction of the railway as defined in section one, whereas the filing of the railway profile and plat secures, but does not define the scope of the grant); Boise Cascade Corp. v. Union Pacific R.R. Co., 630 F.2d 720 (10th Cir. 1980) (Breitenstein, J.) (rights acquired by actual construction even if construction includes lands not depicted in filed profile); see also Minneapolis Railway Co. v. Doughty, 208 U.S. 251 (1908) (approval of map vests title in railway company, but the right of way is determined by where the railway is actually built); Van Dyke v. Arizona Eastern R.R. Co., 248 U.S. 49 (1918) (railway as constructed defined scope of grant, even where constructed in location different from filed map). These 1875 Act cases further illustrate that the map or profile simply vests title in the company, while the first section defines the scope and boundary of the right of way.

Finally, at least one practical concern cannot be squared with the panel's decision. The record and district court's findings demonstrate that strictly adhering to the 1909 map results in some survey points being on dry ground and others being below water. This fact, as found by the district court, shows that strictly applying survey lines in the context of this reservoir is physically impossible and underscores the reason why the Department of Interior instructed surveyors to meander bodies of water. It also explains why § 946 of the 1891 Act must be construed as extending the right of way boundary to "the ground occupied by the water" as the statute's plain language commands.

For these reasons, I respectfully dissent.