WILLIAM JONES AND SYLVESTER MARSH, PLAINTIFFS IN ERROR, *v.* WILLIAM S. JOHNSTON.

Where reference was made in deeds to a recorded plat, and in an ejectment suit, evidence was offered to show that this plat differed from the original plat, the evidence ought not to have been admitted. If an error existed, the proper remedy was in chancery to reform the deeds.

And where the deeds under which both parties claimed, referred to this plat, it was of no consequence, whether or not the plat was recorded precisely according to the requisitions of a statute of the state.

The true rule for the jury, would have been to ascertain whether the lot claimed by the plaintiff had any water front at the time the deed, under which he claimed was executed, and not whether it had a water front at the time when the lot was originally laid out.

In case it should be found that the lot in question was entitled to a water front at the time of the execution of the deed to the plaintiff, then the rule adopted by the court below for dividing the made ground, was not a correct rule.

The true rule pointed out.

THIS case was brought up by writ of error, from the circuit court of the United States, for the District of Illinois.

The case is stated in the opinion of the court, but it is difficult for the reader to understand the points, unless with the assistance of an explanatory map. Many of these were used during the argument, but the sketch here presented, may convey some idea of the locality.

From A to B North Pier.
From C to D South Pier.

Johnston, who brought the ejectment in the court below, was the owner of lot No. 34. Jones and Marsh claimed that lot No. 35 was entitled to the whole benefit of the alluvion. There

were three trials in the court below, the last of which resulted in a verdict and judgment for the plaintiff as follows :—

Beginning at a point on the line between lots thirty-four and thirty-five, in Kinzie's addition to Chicago, Cook county, Illinois, three hundred feet southerly of the south line of North Water street, measuring on that line for distance ; thence south, eleven degrees and thirty minutes, east, one hundred and thirty-five feet, to the north pier ; thence easterly along the north pier to the shore of Lake Michigan ; thence northwardly along the lake shore two hundred and twenty-two feet ; thence westerly in a straight line to the place of beginning.

The instructions given to the jury by the circuit court are stated in the opinion of the court.

It was argued by *Mr. Scammon* and *Mr. Johnston*, for the plaintiffs in error, and by *Mr. Lawrence* and *Mr. Chase*, for the defendant.

On the trial in the circuit court, the counsel for the defendant made twelve prayers to the court; some of which were granted, others with reservations and qualifications. The counsel for the plaintiff made seven prayers, which were qualified in the same way ; and then the court gave other instructions to the jury of its own accord. The arguments of counsel in this court discussed all these points ; and it would not be possible to explain them, without giving too extended a statement of all the points.

Mr. Justice NELSON delivered the opinion of the court.

This is a writ of error to the circuit court of the United States for the district of Illinois.

The suit below, was an action of ejectment, brought by *Johnston*, against Jones and Marsh, to recover a tract of alluvial land in the city of Chicago, formed in Lake Michigan, adjoining the north pier of Chicago harbor, and which is claimed as an accretion to water-lot No. 34, in Kinzie's addition. The defendant, Jones, is owner of lot No. 35, in said addition, lying east, and adjoining 34, and between that and the lake.

Both parties claim under Robert A. Kinzie, the patentee of the north fractional section 10, in township 39, which was situate in the bend of the Chicago River, at its mouth, and bounded southerly by that river, and easterly by the Michigan Lake. Kinzie, the patentee, in February, 1833, laid out an addition to the town of Chicago upon this fractional section, and made a plat of the same, which was recorded in the recorder's office of the county, on the 18th of January, 1834, according to the requirements of the laws of the State of Illinois. On this plat, lot No. 34, is one of a series of water-lots, bounded

on the south side of North Water street, sixty feet, as its northerly boundary, and is included within lines dropped from the fixed corners on that street at right angles with the same, and extended until they intersect the lake shore. Lot No. 35, is the next lot east, of the same width, on Water street, and extended in like manner to the lake, its west line being the east line of 34.

On the 25th of February, 1833, R. A. Kinzie, conveyed to John H. Kinzie, several lots in this addition, and among others, lot No. 35. And on the 1st September, 1834, John H. conveyed the same to Jones, the defendant, describing it in the deed as in Kinzie's addition, and as " being water-lot No. 35," &c., " agreeably to the town plat, recorded in the office of the recorder of the said county of Cook, to which reference may be had if necessary."

On the 22d of October, 1835, R. A. Kinzie, conveyed to Johnston, the plaintiff, lot No. 34, describing it as lying in Kinzie's addition, and known as water-lot No. 34, " as will more fully appear, reference being had to said plat as recorded in the recorder's office of the town of Chicago, in the county of Cook," &c.

In the summer of 1833, the general government commenced the construction of the harbor of the city of Chicago, which is formed by an erection of two piers across this fractional section 10, from the curve of the Chicago River, as it takes a direction southerly to the lake, and for a considerable distance into the lake, the effect of which was to turn the river from its sweep southerly across the sand-bar to the waters of the lake between the two piers, and thus opening a passage for vessels into the town.

The south pier was built in 1833, and the north in 1834. The harbor thus constructed, divided several of the lots in Kinzie's addition that bounded on Water street, east and west, and, among others, as is claimed by the defendant, No. 34, leaving a part of it as originally laid out, south of the harbor.

Since the construction of the harbor and extension of the piers into the waters of the lake, the shore above, or north of the piers, has greatly changed, the firm land having increased by the washing up of sand and earth, and the recession of the waters to the extent of some twelve hundred feet in width, and for a considerable distance in length northward along the shore. The present suit is brought to recover a portion of this alluvion or new-formed land, as an increment or accession to lot No. 34. The plaintiff claims that a part of its southern termination on the lake was north of the piers, and contiguous to the new-formed land, and therefore entitled to its share of the increment. The defendant contends that no part of its boundary was on

the lake north of the harbor, and therefore no part connected with or adjoining this land newly formed. On the contrary, that part of his own lot, No. 35, which lies between 34 and the lake, was bounded on the lake south of the north pier, and hence cut off No. 34 from any portion of the alluvial accession.

The plaintiff insisted, on the trial, that the plat of Kinzie's addition, as recorded in the recorder's office in January, 1834, was incorrect, and produced what was claimed to be the original, but which was not recorded when the conveyances of the lots in question were executed. According to this original plat, as the side lines were laid down, lot No. 34 appeared to be partially bounded on the lake north of the harbor. In this respect, it differed from the plat recorded; as, according to the side lines as there extended, its entire boundary on the lake was south of the harbor.

In laying out the addition by the surveyor in 1833, the only lines of the lots run out or measured on the ground were those butting on Water street, the north lines of the lots. The side lines depend upon their protraction on the plat of the addition; and which, as we have already said, were formed by dropping them at right angles from the corners on Water street, and extending them till they intersected the lake. And even the lake shore, as laid down on the plat—as appears from the testimony of the surveyor—was ascertained without survey or measurement, and with little more accuracy than could be obtained from the eye.

The case was a good deal embarrassed on the trial, arising out of the evidence in respect to this original plat, and some consideration and effect were given to it by the court in submitting it to the jury. We think the court erred in admitting it as evidence to control, or in any way to affect, the recorded plat. Both lots in controversy were conveyed with express reference to that, and without such reference, there is not a sufficient description given in the deeds of the boundaries to admit of a location of either.

If there was in fact any error or mistake in this reference, by way of description of the premises conveyed, the remedy was in chancery to reform the deed. So long as that remained unreformed, the description of the lot by the reference to the recorded plat was conclusive upon the parties.

The acts of the State of Illinois regulating the laying out of town-lots, and the recording of the plats of the same, were supposed by the court below to have a bearing upon the questions involved, and influenced the instructions given and refused to the jury. It seemed to be admitted that the plat recorded did not conform in all respects to the requirement of the statutes.

But it is not pretended that the omission in any way operated to invalidate the deeds, or affect prejudicially the rights of the parties under them. Both parties stand upon the same footing in this respect, as each claims under the same survey of the town, and by reference to the same plat. We do not perceive that these acts of the State have any material bearing upon the case, and should not have been allowed to influence the trial. If the description in the deeds was sufficiently certain, by a reference to the plat on record, to identify and locate the lots, the title passed to the grantees, whether the plat conformed to the acts of the legislature or not. This is all that was material so far as the plat is concerned.

The court, in instructing the jury, observed that the controversy turned upon the length of the line dividing lot 34 from 35, before the north pier was constructed — that whether in point of fact it touched the shore of the lake before it reached the pier, or the place where the pier was; in other words, whether there was any water-line of lot 34 north of the north pier, and if so, what was the extent of the water-line.

Again, the court charged, after adverting to the recorded plat, and to the question whether or not it was made in conformity to the statutes of Illinois, that, if the jury should find the plat was not so made and recorded, then they should determine, under all the evidence in the case, whether or not, prior to the construction of the north pier, the dividing line between lots 34 and 35 touched the water at a point north of where the north pier was subsequently placed; if it did, then the court was of opinion that the owner of 34 had a right to follow the water as the accretions were formed on his water-line.

In these instructions we think the court erred.

As we have seen, this lot No. 34 was conveyed to the plaintiff the 22d October, 1835, and described as included within side lines dropped at right angles from the northwest and northeast corners on Water street, which were sixty feet apart, and fixed, and extended in right lines till they intersected the shore of the lake below. The boundaries, therefore, including and locating the lot were specific and complete. The north boundary was marked on the south side of Water street; the side lines extended according to the plat at right angles from Water street to the lake; the lake was the southern boundary which closed the lines of the lot.

Now, in order to determine what land was conveyed to the plaintiff by his deed of 22d October, 1835, all that was necessary was to locate the lot upon the ground in conformity to the description at that date. The calls in the deed having reference to the plat, furnished the necessary data for the location. There

was the fixed line north on the ground, the lake, a natural object south, and the lot enclosed between two lines extending at right angles from the corners on Water street to the lake.

If the call for the southern boundary, instead of being a lake, which is a shifting line, had been a permanent object, such as a street or wall, there could not be two opinions as to the location. And yet the water-line, though it may gradually and imperceptibly change, is just as fixed a boundary in the eye of the law as the former. I speak not now of sudden and considerable changes, which are governed by different principles.

The court below, as appears from the instructions referred to, assumed that lot No. 34 should be located on the ground as of the time of the survey and plat of February, 1833, some two years and nine months previous to the conveyance to the plaintiff, and not at the date of that conveyance; and if at that time the dividing line between 34 and 35 would strike the lake north of where the north pier of the harbor was subsequently built, so as to give a like boundary at that time above the pier, the plaintiff would be enabled to take under his deed not only lot 34, as laid down on the plat, but all subsequent accretions by alluvion or dereliction, whatever might be the extent of the new-formed land. By the like assumption and process of reasoning, if the present plaintiff should convey the lot with the same specific boundaries, the north line sixty feet on Water street, and side lines extending at right angles to the lake, the deed would carry with it the whole of the new-made land outside the lines of the deed which is now in dispute — it being a tract from one hundred and thirty to two hundred and twenty-two feet one way, and some twelve hundred the other.

Now, one answer to this assumption is, that a grantee can acquire by his deed only the lands described in it by metes and bounds, and with sufficient certainty to enable a person of reasonable skill to locate it, and cannot acquire lands outside of the description by way of appurtenance or accession.

Lord Coke says: " A thing corporeal cannot properly be appurtenant to a thing corporeal, nor a thing incorporeal to a thing incorporeal." Coke Litt. 121, B.

And this court, in Harris et al. *v.* Elliot, 10 Pet. 54, after approving of the maxim of Coke, observed, that, according to this rule, land cannot be appurtenant to land. In the case of Jackson *v.* Hathaway, 15 Johns. R. 454, the court say, a mere easement may, without express words, pass as an incident to the principal object of the grant; but it would be absurd to allow the fee of one piece of land not mentioned in the deed to pass as appurtenant to another distinct parcel which is expressly granted by precise and definite boundaries. See also 7 Mass. 6.

Land gained from the sea either by alluvion or ·dereliction, if the same be by little and little, by small and imperceptible degrees, belongs to the owner of the land adjoining. 2 Bl. Com. 261-2. If, therefore, the rule be as supposed by the court below, that the boundaries of lot 34 must be taken as it would have been located at the time of the plat, and the southern limit to stop at the water-line as it then existed, and the subsequent gain by alluvion or dereliction to pass as appurtenant to the land conveyed, the grantee would find it difficult upon this construction to reach the lake at all. Certainly he could not, if the water-line as it then existed is to be deemed the southern limit as described in his deed, provided alluvial accretions had taken place between the survey and plat and the date of the deed. The land thus formed belonged to the adjoining owner for the time being, and we have seen that the deed would not pass it as appurtenant or incidental to the land granted.

But the true answer to the position assumed, and which governed the trial below, is, that the water boundary on the lake is to be deemed the true southern boundary of the lot at the date of the conveyance, as much so as North Water street was its northern boundary. And the plaintiff is carried by his deed to it, not because of the alluvial deposit, if any, between the water-line at the time of the survey and plat and the line at the date of the deed, having passed as appurtenant to the lot, but because one of the calls given in the deed requires that the side lines should be thus extended. Any alluvial accretions since the deed belong to the plaintiff as owner of the adjoining land. Any past accretions belonged to the then owner, and whoever sets up a title to them must show a deed of the same as in the case of any other description of land.

The case of Robert M. Lamb v. Thomas C. Rickets, 11 Ohio, 311, exemplifies the principle for which we are contending. The defendant had agreed to convey a piece of land called the Hamlin lot, containing forty-two acres more or less, and also two other small lots of ten acres, with a proviso if the Hamlin lot and the two others contained more than fifty-two acres the excess was reserved. The defendant conveyed the Hamlin lot, and refused to convey the other two. A bill was filed to compel a conveyance. The Hamlin lot was bounded by one of its lines on the bank of the Tuscarawas River, and had been originally conveyed to the defendant, and by him to the plaintiff, as containing forty-two acres more or less.

The defence set up to the bill was, that before the defendant conveyed the lot to the plaintiff large accessions had been made from the river to the lot, and that these alluvial formations made up the quantity of fifty-two acres.

The plaintiff claimed that the quantity should be determined according to the old boundary of the lot upon the bank of the river, which would be but some forty-two acres. But the court held that the question was not as the bank of the river was twenty-five or thirty years ago, but as it was when the Hamlin tract was conveyed to the plaintiff, and estimated the quantity of land conveyed accordingly.

The case of Giraud's Lessee *v.* Hughes et al. 1. Gill & Johnson, 249, asserts a similar principle. There Gist's inspection, a grant as early as 1732, was bounded by one of its lines in the waters of the Patapsco River, afterwards a basin of Baltimore; the lines, however, were given in the grant by courses and distances, and did not call for the river. Hughes held under this grant by deed in 1782.

Before 1812, the waters of the Patapsco had gradually receded, and formed a body of firm land, which had been surveyed and patented by the State to the plaintiff. The question was, whether or not Hughes was entitled to this alluvial deposit as the adjoining owner to the river. It was not doubted by the counsel or court but that, if the grant of Gist's inspection had been bounded on the river, this boundary of the tract would have included the land made by the recession of the water; and the court even held, that as the original location of the tract extended into the river, it entitled those holding under it to the land, on the ground that the principle governing these alluvial accretions gave them to the adjoining owner. In other words, the description in the original grant gave, in legal effect, to the grantee, a water boundary; and if so, the boundary included the accretions.

The jury, therefore, in this case, should have been directed to inquire whether or not, at the time of the deed to the plaintiff, lot No. 34 had a water-line upon the lake north of the north pier of the Chicago harbor; — in other words, whether the line between that lot and No. 35 struck the shore of the lake before it reached this pier. If it did, then the question would properly arise in respect to its right to a share of the alluvial accretions formed since that period. If it did not, then no question of the kind could arise in the case.

We think the court also erred in the rule laid down to govern the jury in the division of the new-made land. That was, the jury should ascertain the extent of the water-line of 34 between the piers and the point where the line dividing 34 and 35 touched the water. They should also ascertain the extent of the water-line of the fraction of land south of North Water street and east of 35, and also of 35 to the point dividing 34 and 35; they would then have the plaintiffs' and the defendant's

front on the lake. They must then ascertain the front on the lake shore, as it at present exists, and divide that into as many equal parts as there are feet on the old shore from North Water street to the piers, and give to each of the parties as many of these parts as he had feet on the old shore, and then draw a straight line from the point of division on the old lake shore to the point thus determined as the point of division on the present one.

We do not perceive why North Water street should have been adopted as the northern limit upon the old shore, as the basis in making the division, as it appears from the evidence and maps that the alluvial accretions extended much further north. The northern limit on the old shore should have been carried as far as the new-made land extended, as each riparian proprietor was entitled to his proper share, and it was essential that the entire line be regarded, in order that each might obtain his proportional part. Neither do we perceive any reason for excluding the pier shore of the lake — that is, the shore along the line of the piers — from measurement, in ascertaining the extent of the newly made shore. If we disregard the artificial construction which occasioned the accretions, the lake there is as much new shore as any other portion of it, and should have been taken into the estimate.

As no question was made below whether or not the alluvial accretions in question were formed under such circumstances as gave to adjoining owners a title to them, we do not intend to express any opinion upon that question.

The judgment of the court below is reversed, with directions that a *venire de novo* issue.