STATE OF CALIFORNIA, ex rel.
STATE LANDS COMMISSION,
Plaintiff/Appellant,

v.

UNITED STATES of America, Donald
P. Hodel,* Secretary of the Interior,
et al., Defendants/Appellees.

Sierra Club, et al., Intervenors.

No. 85–1965.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 14, 1986.

Decided Dec. 2, 1986.

* Donald P. Hodel has been substituted for Cecil D. Andrus as defendant-appellee in this appeal pursuant to Federal Rule of Appellate Procedure 43(c)(1).

Joseph Barbieri, San Francisco, Cal., Marray G. Sagsveen, Bismarck, N.D., for plaintiff/appellant.

Larens H. Silver, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., William B. Lazarus, U.S. Dept. of Justice, Washington, D.C., for defendants/appellees.

Before KENNEDY, REINHARDT, and BRUNETTI, Circuit Judges.

REINHARDT, Circuit Judge:

The State of California appeals from a judgment awarding the United States title to land exposed by the recession of Mono Lake. California argues that the district court erred in 1) adopting federal rather than state law as the rule of decision to determine the ownership of the exposed lake bed; 2) applying the law of reliction to the recession of Mono Lake; 3) selecting the methodology to be used in determining whether the recession of the Lake has been "gradual and imperceptible" for purposes of the reliction doctrine; and 4) granting intervention to the Sierra Club and the Natural Resources Defense Council. We affirm all of the district court's challenged rulings and uphold its judgment in favor of the United States.

## I. FACTS

Mono Lake is a navigable lake that lies at the bottom of the Mono Basin immediately east of the Sierra Nevada in eastern California. All drainage in the Mono Basin flows toward the Lake; no outlet streams exist.

The United States owns approximately seventy percent of the uplands surrounding Mono Lake. The federal lands were withdrawn from the public domain in the early 1930's in order to protect the watershed and to preserve the land for grazing, recreation, and other uses. Private parties own the remaining thirty percent of the Mono uplands. The State of California owns the bed of Mono Lake, which, as land underlying navigable water within its boundaries, it acquired upon admission to the Union. *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 370, 97 S.Ct. 582, 587, 50 L.Ed.2d 550 (1977).

In 1940, the City of Los Angeles, pursuant to permits issued by the State, began diverting water from Mono Lake's four main feeder streams to help supply the City's water needs. At that time, the Lake

occupied an elevation of 6,417 feet above sea level. Increased diversions since 1974 have essentially halted the inflow to the Lake from the feeder streams. The lake waters have receded to an elevation of 6,380 feet above sea level; approximately 12,000 acres of lake bed have been uncovered as a consequence of the recession. The exposed lake bed contains valuable mineral and geothermal resources. The parties agree that the waters of Mono Lake will continue to recede as a result of the City's diversions.

## II. PROCEDURAL HISTORY

California filed a quiet title action against the United States in 1980 to claim title to the exposed lake bed. The Sierra Club and the Natural Resources Defense Council intervened on behalf of the United States. The parties filed cross-motions for summary judgment on the choice of law issue. California urged that state law, which it contended would vest title to the exposed lake bed in the State, should supply the rule of decision. The United States argued that the federal common law of reliction should apply. Under the federal rule, when a body of water serving as the boundary between two parcels of property gradually and imperceptibly recedes, the exposed land belongs to the upland owner. The doctrine of reliction contrasts with the avulsion doctrine, which provides that when a body of water serving as the boundary between two parcels of property violently shifts its course, the property boundary does not shift with the water, but remains in its former location. If the exposed lake bed constitutes relicted land, under federal common law the United States, as upland owner, would own the exposed bed as well.

The district court held that federal law governs the case and that the federal com-

mon law of reliction should supply the rule of decision. The case went to trial on the issue whether the disputed lands were formed by the process of reliction. The outcome turned on whether the recession of the Lake had been gradual and imperceptible. California and the United States disagreed over the proper methodology for determining whether a change in a water boundary has been "gradual and imperceptible." After a bench trial, the court adopted the methodology urged by the United States and ruled that the recession of Mono Lake had been gradual and imperceptible. The court awarded the United States the exposed lake bed under the law of reliction.

We review *de novo* the district court's decision to apply the federal rule of reliction to the recession of Mono Lake. *United States v. McConney,* 728 F.2d 1195 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We also review *de novo* the district court's choice of methodology to be used in determining whether the recession of the Lake has been gradual and imperceptible. *Id.* We review the findings made as a result of applying that methodology under the clearly erroneous standard. *Id.* A grant of permissive intervention is reviewed for an abuse of discretion. *Smith v. Pangilinan,* 651 F.2d 1320, 1325 (9th Cir.1981).

## III. ANALYSIS

### A. *Choice of Law*

Federal law governs disputes over claims that there has been a reliction or accretion to federal land. *See California ex rel. State Lands Commission v. United States,* 457 U.S. 273, 283, 102 S.Ct. 2432, 2438, 73 L.Ed.2d 1 (1982) (*State Lands Commission* ).[1] California does not

---

1. Although *State Lands Commission* involved accretions to federal land, whereas this case involves an alleged reliction, neither party suggests that the difference has any relevance to the choice of law determination. An "accretion" occurs where bits of rock, sand, and dirt accumulate on a shore and push the water line

back, thereby creating new land. A "reliction" occurs where land is exposed by the imperceptible recession of water. The "terms are often used interchangeably, and law relating to accretions applies in all its features to relictions." 3 *American Law of Property* § 15.26 at 855 (A.J. Casner ed. 1952) (cited in *Oregon ex rel. State*

dispute that federal law governs the present case since the United States owns the uplands to Mono Lake and claims title to the exposed lake bed. Controversies governed by federal law, however, do not necessarily require the application of a uniform federal rule of decision. In some categories of cases, courts must balance the federal and state interests in the application of their own rules to the issue at hand, and, where the balance favors doing so, borrow state law as the rule of decision. *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 671–72, 99 S.Ct. 2529, 2539–40, 61 L.Ed.2d 153 (1979). California argues that the present case is a proper one for the application of the *Wilson* balancing test, and that under that test state law should supply the rule of decision.

■ California's assumption that we may adopt state law as the rule of decision in this case under the *Wilson* balancing test is erroneous in light of the Supreme Court's decision in *State Lands Commission*. *State Lands Commission* involved a dispute between California and the United States over accretions to federally owned ocean front land. California owned the submerged tidelands by virtue of its sovereign status. California alleged that under state law, it was entitled to the accretions because of its ownership of the submerged tidelands. The United States alleged that under federal law, it was entitled to the accretions because of its ownership of the uplands abutting the submerged tidelands. The Supreme Court held that because Congress has addressed the issue of accretions to federal lands abutting state-owned submerged lands in section 5(a) of the Sub-

merged Lands Act, 43 U.S.C. § 1313(a) (1982), that section precludes borrowing for federal law purposes a state rule that would "divest" the United States of ownership of accreted lands. 457 U.S. at 283–84, 102 S.Ct. at 2438–39. Section 3 of the Act confirms and vests in the states "title to and ownership of the lands beneath navigable waters within [their] boundaries." 43 U.S.C. § 1311(a); section 5(a) of the Act withholds from the operation of section 3 all "accretions" to lands acquired or reserved by the United States.[2] In light of section 5(a), the Court "appl[ied] the federal rule that accretions, regardless of cause, accrue to the upland owner," and ruled that the United States held title to the disputed land. 457 U.S. at 285, 102 S.Ct. at 2439.

Because in the present case the United States' claim is based in part on section 5(a) of the Submerged Lands Act,[3] we follow *State Lands Commission* and apply a federal rule of decision; we do so without balancing, under *Wilson*, the varying federal and state interests in the application of their respective law. California claims the exposed lake bed by virtue of its sovereign ownership of the submerged lake bed. The United States claims the lands by virtue of its status as a littoral owner. As we have noted, relictions are treated in the same manner as accretions, *see supra* note 1; section 5(a)'s reservation of accretions therefore encompasses relictions. Thus, section 5(a) reserves from California's ownership of the Mono lake bed all relictions to the federal uplands. In light of section 5(a), *State Lands Commission* precludes us from borrowing a state rule that would

---

Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363, 387 n. 7, 97 S.Ct. 582, 591 n. 7, 50 L.Ed.2d 550 (1977) (Marshall, J., dissenting on other grounds)).

**2.** In relevant part, section 5(a) excepts "all tracts or parcels of land together with all accretions thereto ... title to which has been lawfully and expressly acquired by the United States ..., and all lands ... expressly retained by or ceded to the United States when the State entered the Union." 43 U.S.C. § 1313(a). Although the statute expressly mentions "accretions" only in connection with federal acquired lands, accretions

to retained lands are similarly excepted from the operation of section 3. *State Land Commission,* 457 U.S. at 283 n. 11, 102 S.Ct. at 2438 n. 11.

**3.** The Submerged Lands Act applies to lands beneath inland lakes as well as coastal waters. *See* 43 U.S.C. § 1301(a) ("[t]he term 'lands beneath navigable waters' means (1) all lands within the boundaries of each of the respective States which are covered by nontidal [navigable] waters ... as ... modified by accretion, erosion, and reliction.").

"divest" the United States of ownership of the relicted land and award it to the state.

■ That California disputes the United States' contention that the recession at Mono Lake constitutes a reliction does not affect the choice of law determination under *State Lands Commission.* Although the Court there noted that both parties agreed that the disputed land constituted an accretion, 457 U.S. at 287, 102 S.Ct. at 2440, the Court did not suggest that had the parties disagreed over the proper characterization of the change in the land, state law could have been adopted as the standard for determining the question. The Court's rationale for the application of a federal ownership rule—that section 5(a) forecloses "borrowing for federal-law purposes a state rule that would divest federal ownership" of land that is the subject of that section, 457 U.S. at 284, 102 S.Ct. at 2439—mandates the application of federal principles of law in characterizing the disputed land changes in this case. A state's definition of accretions and relictions may be no less hostile to federal interests than its ownership rules.

■ California argues against the application of *State Lands Commission* to the present case on several grounds, all of which we reject. First, California argues that section 5(a) does not affect the choice of law determination in disputes involving inland waterways. It contends that because the Act merely *confirms* the states' title to submerged lands beneath their inland waterways, whereas it *vests* title in the states to submerged coastal lands, it has no "substantive legal effect" with regard to inland waterways. This analysis is erroneous. Section 5(a) excepts from the operation of section 3 federal lands and all accretions thereto. That "substantive legal effect" is independent of the distinction in section 3 between a grant and a confirmation of the states' title. Congress' authority to except accretions from its confirmation of title to submerged inlands is no different from its authority to except accretions from its grant of title to submerged

coastal lands. Section 5(a) therefore has the same choice of law consequence in an inland waters dispute as in a coastal waters dispute.

California attempts to support its claim that section 5(a) of the Submerged Lands Act has "no substantive legal effect" with regard to inland waters, and hence that *State Lands Commission* does not govern the present case, by pointing to the fact that the Supreme Court in *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979), adopted a state rule of decision in an inland waters property dispute without mentioning the Submerged Lands Act. California infers from that fact that the Court shares its view of the Act as irrelevant to inland waters disputes. In further support of this claim, California notes that in this circuit we have followed *Wilson* by adopting a state rule of decision in three cases involving inland waters disputes without making any reference to the Act. *See Puyallup Indian Tribe v. Port of Tacoma,* 717 F.2d 1251 (9th Cir. 1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1324, 79 L.Ed.2d 720 (1984); *United States v. Aranson,* 696 F.2d 654 (9th Cir.), *cert. denied,* 464 U.S. 982, 104 S.Ct. 423, 78 L.Ed.2d 358 (1983); *United States v. Harvey,* 661 F.2d 767 (9th Cir.1981), *cert. denied,* 459 U.S. 833, 103 S.Ct. 74, 74 L.Ed.2d 72 (1982).

California's argument fails. Section 5(a) of the Act had no application to the factual situation in *Wilson.* In *Wilson,* land from an Indian reservation on the west bank of the Missouri River was eroded by the River and deposited on the east bank, which was owned by a number of parties including Iowa. The Tribe and the east bank landowners each claimed the land. The Tribe claimed that the land deposited on the east bank remained part of the reservation under the doctrine of avulsion.[4] The east bank landowners claimed the land as an accretion to their riparian property. The parties disputed whether federal or state law should be used to decide whether the

4. For a definition of avulsion, see *supra* at p. 860.

land in dispute had formed by the process of avulsion or accretion. The Court held that there is no need for a uniform federal rule to govern disputes between the United States and other riparian owners. As long as states apply their rules governing riparian ownership even-handedly, the United States stands to gain land from, as often as it would lose land to, the opposing riparian owner. *Wilson*, 442 U.S. at 673, 99 S.Ct. at 2540–41. Moreover, were federal law to govern disputes between the United States and other riparian owners, those other owners' rights would be subject simultaneously to different laws, depending fortuitously upon whether the non-federal owner asserted its rights against a federal or against a non-federal party. *Id.* at 674, 99 S.Ct. at 2541.

Since *Wilson* involved a dispute between riparian owners, the case did not implicate section 5(a) of the Submerged Lands Act. Although Iowa was a party to the dispute, it did not rely on its sovereign status as owner of its submerged lands in claiming the land but rather on its riparian rights. It stood in no different position than the other east bank owners.

 Section 5(a) comes into play only in disputes between the United States and a state claiming land by virtue of its sovereign ownership of submerged lands. The section excepts accretions to federal land from the grant or confirmation of *submerged lands* to the states; that exception does not affect disputes concerning the rights of other riparian or littoral owners.

 Moreover, although we do not apply the *Wilson* balancing test here, the various factors that comprise that test suggest why federal law must govern disputes between the United States as a riparian or littoral owner and the state as a submerged lands owner. First, the state and the United States will always occupy the same relative positions in such disputes. The state, therefore, could adopt property rules that would always award disputed land to the submerged lands owner and thus that would always be injurious to the interests of the United States. Second, application

of a federal rule to submerged lands disputes between a state and the United States will not have an arbitrary impact on any private property rights or interests, since they will continue to be governed in each instance by state law.

None of the three Ninth Circuit cases cited by California implicated the Submerged Lands Act, since none involved disputes between the United States as a riparian or littoral owner and a state as a submerged lands owner. *See Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251 (9th Cir.1983), *cert. denied*, 465 U.S. 1049, 104 S.Ct. 1324, 79 L.Ed.2d 720 (1984); *United States v. Aranson*, 696 F.2d 654 (9th Cir.), *cert. denied*, 464 U.S. 982, 104 S.Ct. 423, 78 L.Ed.2d 358 (1983); *United States v. Harvey*, 661 F.2d 767 (9th Cir. 1981), *cert. denied*, 459 U.S. 833, 103 S.Ct. 74, 74 L.Ed.2d 72 (1982).

Second, California argues that *State Lands Commission* does not apply because, as the Court stated, it was "not a case in which federal common law must be *created*," 457 U.S. at 284, 102 S.Ct. at 2439 (emphasis in original), whereas, according to California, the present case necessitates the creation of new law. California claims that what it terms "the intentional uncovering" of a lake presents a novel circumstance within federal law. It argues, on that basis, that federal law must be created in order to determine whether the recession at Mono Lake constitutes a reliction.

 We reject California's argument. First, the Supreme Court in *State Lands Commission* did not suggest that section 5(a) mandates the adoption of a federal rule of decision *only* where federal law is well-settled. Second, the law of reliction *is* well-settled, *see State Lands Commission*, 457 U.S. at 284, 102 S.Ct. at 2439, and it encompasses the recession that occurred at Mono Lake. Federal law defines a reliction as previously submerged land which becomes exposed by the gradual recession of water. *See, e.g., United States v. Ruby Co.*, 588 F.2d 697, 701 n. 4 (9th Cir.1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61

L.Ed.2d 284 (1979); *Bear v. United States,* 611 F.Supp. 589, 593 n. 2 (D.Neb.1985). The federal law makes no exception for relictions or accretions resulting from artificial causes. *See, e.g., State Lands Commission,* 457 U.S. at 285, 102 S.Ct. at 2439; *County of St. Clair v. Lovingston,* 90 U.S. (23 Wall.) 46, 66, 23 L.Ed. 59 (1874); *United States v. Claridge,* 416 F.2d 933, 935 (9th Cir.1969), *cert. denied,* 397 U.S. 961, 90 S.Ct. 994, 25 L.Ed.2d 253 (1970). The Supreme Court has applied the accretion doctrine to additions to lake uplands resulting from artificial causes. *See Jones v. Johnston,* 59 U.S. (18 How.) 150, 152, 15 L.Ed. 320 (1856) (accretions to shore of Lake Michigan resulting from construction of harbors and piers); *see also Banks v. Ogden,* 69 U.S. (2 Wall.) 57, 17 L.Ed. 818 (1865). California attempts to distinguish *Jones* and *Banks* by characterizing the recession as an "intentional uncovering." It then seeks to bring this case under state case law awarding to the state lands that are deliberately exposed by a reclamation project. This attempt fails. That the recession may have been a "necessary effect" of the City's diversion of the Lake's feeder streams does not mean that the land was intentionally uncovered. Moreover, California does not challenge the district court's finding that the diversions at the Mono Basin do not constitute a drainage or reclamation project. It is clear, in fact, that when the State authorized the City to divert the water from the feeder streams neither the City nor the State was motivated by a desire to reclaim any lands underlying Mono Lake.

Finally, even were California correct that this case necessitates the "creation" of law, we would not on that basis find the case inappropriate for decision under a federal rule. California's argument is anomalous; it overlooks the fact that the cases which now constitute established law themselves necessarily "created" law when they were first decided.

We conclude that under *State Lands Commission* the district court properly adopted the federal reliction doctrine as the rule of decision in the present case. More-over, even were we to analyze the choice of law question under the *Wilson* balancing test, we would reach the same result. For the reasons discussed *supra* at 863, the *Wilson* factors would mandate adoption of a federal rule of decision in cases in which a state claims lands by virtue of its status as the submerged lands owner and the United States claims those same lands as the littoral or riparian owner.

### B. *Application of the Reliction Doctrine*

 When a body of water defines the boundaries of private property, problems of boundary definition will arise when the water body shifts its course or changes in volume. The doctrines of accretion and reliction on the one hand and avulsion on the other provide a framework for resolving boundary disputes arising from the dynamic nature of water. When a water line that constitutes a property boundary changes gradually and imperceptibly by the gradual deposit of solid material on its shore (accretion) or by gradual recession (reliction), the property boundary changes with it. *See Bonelli Cattle Co. v. Arizona,* 414 U.S. 313, 325–26, 94 S.Ct. 517, 525–26 38 L.Ed.2d 526 (1973), *overruled on other grounds, Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977). In such a situation, title is "ambulatory." However, where a water line changes violently and visibly, i.e., by avulsion, the property boundary does not change with the water but remains where it was prior to the change. *See Philadelphia Co. v. Stimson,* 223 U.S. 605, 624, 32 S.Ct. 340, 346, 56 L.Ed. 570 (1911).

 California claims that the district court misapplied the test for determining whether a reliction is "gradual and imperceptible." In its conclusions of law, the court quoted the federal common law rule of perceptibility (the *"Lovingston* test"):

It is not enough that the change may be discerned by comparison at two distinct points of time. It must be perceptible

when it takes place. "The test as to what is gradual and imperceptible in the sense .of the rule is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on."

*Stimson,* 223 U.S. at 624, 32 S.Ct. at 346 (quoting *County of St. Clair v. Lovingston,* 90 U.S. (23 Wall.) 46, 68, 23 L.Ed. 59 (1874)). The district court found as a fact that the average person would not have observed the movement of the shoreline as it was occurring.

California does not challenge the court's finding that an average person would not have observed the shoreline migrations as they were occurring.[5] Rather, it attempts to replace the perceptibility test with a measurability test. Since the shoreline migrations were *measurable* over relatively short periods of time, California argues that they were not "gradual and imperceptible." At trial, California presented computer-generated data of shoreline migrations occurring over periods of weeks, days or hours. It computed those migrations at selected areas of the Lake with the gentlest shoreline slopes. In such areas, a small change in lake elevation will produce a greater change in shoreline position than where the shore slope is steep. California gathered its data during periods of greatest daily and annual evaporation. It admits that daily shoreline migration correlates with variations in evaporation.

We need not determine here whether the *Lovingston* perceptibility test should be literally applied, though such an application may well be the proper one. Here, the methodology adopted by the district court for determining whether the shoreline change was gradual and imperceptible was in fact consistent with utilization of a measurability standard, the standard suggested by California, and constituted as favorable an application of *Lovingston* as the state could possibly have been entitled to.

The district court took into account measurable changes in the Mono shoreline. It reached its conclusion that the recession was "gradual and imperceptible," however, by averaging measurable shoreline change over the entire lake shore and by discounting those changes attributable to daily evaporation and seasonal fluctuations. The district court calculated average shoreline migration on the basis of ninety percent of the daily declines since 1940 and on a set of twenty-six profiles of the shore slope ·from around the Lake. The average shoreline migration since 1940 has been .30 feet per day on the steeper western side of the Lake and .32 feet per day on the gentler eastern side. As these migration figures show, shoreline migration over the Lake as a whole has clearly not been sudden and perceptible. More important, California's gradual loss of its property in the lake bed as a whole over the last several decades is in no way comparable to a riparian owner's sudden loss of property when a river violently changes course.

California's real complaint is with the court's use of averages for determining whether the shoreline change was gradual and imperceptible, although California does not ·challenge that methodology explicitly. We find the court's methodology to constitute a sensible interpretation of the *Lovingston* perceptibility test, especially in the context of a lake. We affirm the district court's use of that methodology in determining whether the Mono Lake recession was gradual and imperceptible.

## C. *Grant of Intervention*

The district court did not specify whether it granted intervention to the Sierra Club and the Natural Resources Defense Council as of right under Fed.R. Civ.P. 24(a) or permissively under Fed.R. Civ.P. 24(b). California challenges the grant under the abuse of discretion standard appropriate to permissive intervention under Rule 24(b). We treat the grant as

---

**5.** California's own expert testified that he never actually perceived the shoreline migrations while at the Lake and that an average observer would not be able to do so.

permissive and review it under an abuse of discretion standard.

We hold that the court did not abuse its discretion in granting intervention to the Sierra Club and the Natural Resources Defense Council. The intervenors' defense to California's suit presented questions of law and fact in common with the main action. Moreover, California does not allege that it has been unduly prejudiced by the intervention.[6] Thus, the grant was proper.

## IV. CONCLUSION

We affirm under *State Lands Commission* the district court's choice of a federal rule of decision in the present dispute. We affirm the court's application and construction of the federal law of reliction to the recession at Mono Lake, and thus affirm the judgment granting the United States title to the exposed lake bed. We affirm the grant of intervention.

AFFIRMED

---

6. We need not consider whether or under what circumstances an erroneous grant of intervention could constitute reversible error under Fed. R.Civ.P. 61.