**L & M ENTERPRISES, INC., Plaintiff,**

v.

**BEI SENSORS & SYSTEMS COMPANY, Edcliff Instruments Division, Defendant.**

**No. 98–1100–JTM.**

United States District Court, D. Kansas.

March 30, 1999.

---

William Robert Martin, Lawrence J. Logback, Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, Donald C. Tinker, Jr., Robbins, Tinker, Smith & Tinker, Wichita, KS, for plaintiff.

Vince P. Wheeler, Kahrs, Nelson, Fanning, Hite & Kellogg, Witchita, KS, Ronald K. Badger, Wichita, KS, for defendant.

## ORDER

MARTEN, District Judge.

This matter is before the court on a motion for summary judgment filed by BEI Sensors & Systems Company ("BEI"). L & M Enterprises, Inc. ("L & M") has sued BEI for breach of contract, specifically, a Distribution Agreement dated September 1, 1994, for tortious interference with contracts and business relationships, and for punitive damages. BEI denies these claims and seeks summary judgment. L & M opposes BEI's motion. The court has examined the parties' submissions and is prepared to rule. For the reasons set forth below, BEI's motion is granted.

## I. Summary Judgment Standards

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *Diamond Bar Cattle Co. v. United States*, No. 97–2140, 1999 WL 88945, at *2 (10th Cir. Feb.23, 1999).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II. Factual Background

L & M, a Kansas corporation with its principal place of business in Wichita, Kansas, is a wholesaler and distributor of aircraft-related systems, equipment, and parts. BEI, a Delaware corporation with its principal place of business in Sylmar, California, is engaged in the design and

manufacture of aircraft-related systems, equipment, and parts.

During the summer of 1994, Bill Lewis, president of L & M, Doug Moody, manufacturing representative for BEI, and Rob Baker, marketing manager for BEI, had several conversations and meetings related to L & M becoming the distributor for two repair kits produced by BEI. BEI's repair kits are used in the repair and rebuilding of certain test equipment used in the calibration of critical flight instruments, including those used in military aircraft. BEI initiated the discussions. As a distributor, L & M was "to market and to sell these kits, identify the requirements that were out in the marketplace and fill those requirements." Baker Dep. at 23. BEI thought L & M could develop a large market and, as a small minority business, L & M would have an advantage in dealing with government contractors. On September 1, 1994, L & M and BEI entered into a distribution agreement ("Distribution Agreement") whereby L & M would become the exclusive worldwide distributor for the kits.

The Distribution Agreement contained no payment terms. However, L & M's first purchase order for kits, dated August 18, 1994, provided for payment terms "net 30." It also set forth these terms and conditions: "Acceptance of this purchase order or shipment of any part of it will constitute agreement to all of its specifications as to *terms*, deliveries, and prices." L & M Purchase Order No. 9199, ¶ 8 (emphasis added). Altogether, L & M submitted four purchase orders, all of which provided for payment "net 30." BEI's first four invoices, which reflected shipment of kits to fill L & M's first two purchase orders, provided for payment "net 30." BEI's fifth invoice, dated January 18, 1995, and all subsequent invoices reflected payment terms as "net 45 days."

In April 1995, Steve Cormier, a BEI employee, claims L & M's accounts receivable ledger came to his attention and that he began calling L & M's accountant, Keith Widmer, inquiring about L & M's failure to pay its bills. Widmer claims he had no communications with Cormier regarding payment on L & M's account until September or October 1995. He states that prior to September 1995, all of his communications with BEI were made through Judy Gray, who worked in BEI's accounting department. BEI claims from July 1995 to October 1995, it was constantly in contact with L & M regarding payment of its bills and that Cormier began calling Lewis, L & M's president. Lewis denies speaking to Cormier prior to November 1995.

By October 31, 1995, L & M owed BEI in excess of $430,000.00. Of this amount, $120,752.24 [1] was from accounts that were between 91 and 120 days past shipping, and $137,724.26 was debt that was more than 120 days past shipping. In October 1995, Cormier was seeking to salvage L & M as a BEI distributor and was "working every angle" to collect its past due accounts from L & M while continuing to ship products to them. Cormier Dep. at 40.

On or about November 1, 1995, the parties reached an arrangement for the payment of L & M's past due account as well as payment for future shipments. Specifically, L & M agreed to pay BEI $140,000.00 in the last quarter of 1995, $125,000.00 in the first quarter of 1996, and $125,000.00 in the second quarter of 1996. Further, BEI claims L & M agreed to pay current invoices within 45 days. L & M disputes the 45-day turnaround; its representatives claim 60 days had been mentioned during the parties' negotiations. The evidence before the court, however, does not support L & M's contention. L & M's purchase orders submitted after the parties' November 1995 agreement reflect that payment was due "net 30." And,

---

1. L & M points out that $45,000 of the $120,752.24 was related to the Cessna transducers, which were not subject to the Distribution Agreement at issue.

BEI's invoices indicate payment was due "net 45." Therefore, it appears L & M had 45 days after receiving the goods to remit payment to BEI.

On December 29, 1995, BEI shipped 50 kits to L & M "net 45 days." BEI contends that payment of $42,365.50 for those kits was due February 11, 1996, and that L & M failed to make its payment on time.[2] L & M controverts that payment was due on those 50 kits within 45 days, because BEI shipped them ahead of L & M's requested shipping date. According to L & M, under prior agreements between the parties, L & M was not required to pay for kits shipped ahead of schedule until they were sold. Therefore, according to L & M, it was not required to pay for the kits shipped under the established shipping schedule until 45 to 60 days after it sold the kits. It claims it paid for the kits within two days of receipt of monies for the kits from its purchasers.

On January 16, 1996, BEI shipped 5 kits to L & M, "net 45 days." According to BEI, payment of the $4,265.00 for those kits was due March 2, 1996, but L & M failed to make payment on time. L & M made its payment on March 18, 1996, 16 days after the 45–day period expired.

Tesco was one of L & M's customers. As part of a government contract, Tesco needed the repair kits that were the subject of the BEI/L & M Distribution Agreement. On January 19, 1996, Tesco issued a release order to L & M for twenty kits.[3] In early February 1996, a representative from L & M contacted Albert Hazan, BEI's marketing director, regarding kits which L & M needed to ship to Tesco. According to L & M, Hazan stated he would not ship the kits unless L & M agreed to pay $300 above the previously agreed upon price. Ralph Challoner, Tesco's director of business operations, called L & M asking why the kits Tesco ordered were not being delivered. Lewis explained that it was not L & M's problem, but BEI's problem, due to "quality issues" involving a machine shop used by BEI. In February 1996, Challoner asked Lewis if he (Lewis) would mind if Challoner called BEI directly to inquire about the situation. L & M was telling Challoner it could not get parts from BEI. Challoner called Hazan and Ramesh Pavasia, BEI's vice-president and general manager. After talking to Hazan, Challoner believed BEI was trying to work with L & M to resolve BEI's and L & M's difficulties. He never understood that L & M was being discontinued as a distributor forever. Rather, he understood that if and when the issues between L & M and BEI were resolved, L & M would continue to be BEI's distributor.

After Challoner called BEI in February 1996, Hazan and Cormier told Pavasia about Tesco's need for parts. According to BEI, Pavasia called Lewis and Larry Widmer of L & M, proposing that BEI sell the parts directly to Tesco and pay the commission or work out the difference with L & M. BEI claims Lewis and Widmer gave BEI permission to ship the parts to Tesco, and that both L & M and BEI were primarily concerned with meeting the customer's needs. Lewis and Widmer deny authorizing BEI to sell the kits to Tesco outside the Distribution Agreement.[4]

On February 21, 1996, Hazan responded by fax to Tesco's request for prices, advis-

---

2. L & M made the following payments:

| Date Paid | Amount | No. of days after 45–day period expired according to BEI's schedule |
|---|---|---|
| 2/17/96 | $20,280.00 | 6 |
| 3/14/96 | $ 5,070.00 | 32 |
| 3/27/96 | $17,015.50 | 45 |

3. On November 7, 1995, Tesco had placed a purchase order with L & M for kits and on January 19, 1996, Tesco issued a release order for the final 20 kits due on the order.

4. Lewis does admit that in the spring of 1996 he contacted Pavasia and granted BEI permission to sell pressure transducers to Cessna, but he never gave BEI permission to sell kits to Tesco.

ing Challoner that BEI would accept inventory for full credit if Tesco later received parts from L & M in excess of Tesco's needs. At some point during this time, Challoner contacted Lewis and told him BEI had instructed him to cancel Tesco's purchase order with L & M. Challoner further advised Lewis that BEI offered to pay any restocking charges L & M assessed against Tesco for cancellation of the purchase order. On February 22, 1996, Tesco issued its purchase order to BEI for twenty kits.

On February 23, 1996, BEI shipped twenty kits, three motors and two gears to Tesco. Only the kits were covered by the Distribution Agreement. BEI claims that a couple of days before its shipment to Tesco, it made an agreement with L & M that once the parties got back into good payment terms, BEI would pay L & M the three hundred to four hundred dollars difference on the sales to Tesco.

The parties dispute who initiated the events leading to the BEI/Tesco arrangement. BEI claims Challoner contacted BEI in February 1996, and that BEI did not solicit Tesco's business. L & M argues that Challoner's telephone records of February 16, 1996, indicate Hazan contacted Tesco advising that L & M was not selling BEI parts, but that BEI would "fulfill any and all requirements" Tesco had. Challoner Dep. at 102. If Tesco was unable to obtain BEI parts in February 1996, it would have lost its contract with the government. Challoner did not believe in February 1996, there was any reasonable possibility of receiving parts from L & M in time to fulfill its government contract obligations. BEI claims that it alone could have supplied the parts in February 1996. However, L & M contends KIM, Inc.'s kits could have been substituted for the BEI kits.

At some point in early 1996, L & M's attorney prepared a "Memorandum of Understanding Between BEI and L & M Enterprises, Inc.," which was different from the "understanding" reached in No-

vember 1995. The memorandum recited that BEI and L & M were seeking to maintain their business relationship and to provide for payment of amounts due to BEI with personal guarantees from "L & M Management." It also stated that a new Distribution Agreement would be negotiated.

An "Agreement to Repay Debt" and a "Guaranty Agreement for Payment Under Agreement to Repay Debt" were prepared and a new "Distribution Agreement" was negotiated, and on March 12, 1996, L & M faxed those documents to BEI. L & M officers had signed the Agreement to Repay Debt and the Distribution Agreement. Larry Widmer and Lewis had signed the Guaranty; Harris Widmer had not. On March 14, 1996, another Guaranty, which included Harris Widmer's signature, was prepared but never sent to BEI. That same day, Lewis sent a letter to Pavasia stating that the documents faxed to BEI on March 12, 1996, were withdrawn and of no "further force and effect." L & M claims it did not fax the agreement because L & M discovered BEI had shipped items directly to Tesco in violation of the Distribution Agreement. After receiving the letter, Pavasia determined to discontinue doing business with L & M.

BEI sent a Notice of Cancellation, dated April 3, 1996, to L & M canceling the September 1, 1994 Distribution Agreement for failing to pay amounts due. On that same day, it also sent a Notice of Termination terminating the Distribution Agreement, effective 120 days from the date of the notice.

L & M claims BEI lacked authority to terminate the Distribution Agreement. The Distribution Agreement contains no specific provision for duration of the contract. Many views have been put forth regarding the agreement's duration. Whether the parties had a right to terminate the agreement is an issue the court need not decide. For the reasons stated below, the court finds BEI's cancellation of

the contract was justified. Therefore, BEI was not required to give L & M a "Notice of Termination."

## III. Breach of Contract Claim

L & M argues BEI breached the September 1, 1994 Distribution Agreement by selling parts that were covered by the agreement. BEI contends L & M breached the Distribution Agreement by its failure to pay for parts, and therefore, BEI's subsequent cancellation of the agreement was not a breach. In addition, BEI claims L & M repudiated the Distribution Agreement by its failure to provide adequate assurances for payment.

■ As a preliminary matter, the court notes that a distribution agreement is generally treated as a contract for the sale of goods under the Uniform Commercial Code ("UCC"). *Sally Beauty Co. v. Nexxus Prods. Co.*, 801 F.2d 1001, 1005–06 (7th Cir.1986); *see also Paulson, Inc. v. Bromar, Inc.*, 775 F.Supp. 1329, 1333 (D.Haw. 1991) (citing sixteen states that have held the UCC applies to distribution agreements). Therefore, the court will look to the Kansas version of the UCC for guidance in this matter.

■ The UCC makes a distinction between cancellation and termination:

"Termination" occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On "termination" all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives.

"Cancellation" occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of "termination" except that the canceling party also retains any remedy for breach of the whole contract or any unperformed balance.

Kan. Stat. Ann. § 84–2–106(3), (4). Termination of a contract requires reasonable notification by the party seeking to termi-

nate the agreement. Kan. Stat. Ann. § 84–2–309(3). Cancellation, on the other hand, does not require reasonable notification. *Id.* § 84–2–703(f). Furthermore, unlike termination, cancellation is a right that does not arise out of any provision in the contract. *Frigiking, Inc. v. Century Tire & Sales Co.*, 452 F.Supp. 935, 938 (N.D.Tex.1978).

The UCC also sets forth the obligations of the parties to a contract. Specifically, it states that "[t]he buyer must pay at the contract rate for any goods accepted." *Id.* § 84–2–607(1). A buyer's failure to make payment due justifies cancellation of a contract. *Id.* § 84–2–703(f); *see also ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 649 (2nd Cir. 1991) ("[F]ailure to tender payment is generally deemed a material breach of a contract.") (citing *Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1014 (D.C.Cir.1985)).

Several courts faced with circumstances similar to those in this case have found manufacturers were justified in canceling distribution agreements due to distributors' chronic, large overdue balances. *See, e.g., Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir.1983); *Frigiking*, 452 F.Supp. 935. In *Frigiking*, the distributor had been late on payments and had been developing a large, overdue balance in its open account with the manufacturer. *Frigiking*, 452 F.Supp. at 937. The court found the manufacturer was "well within its rights in cancelling the distributorship agreements because of [the distributor's] chronic large overdue balances." *Id.* at 938. It also found the manufacturer had justifiably concluded that the distribution agreements had been breached by the distributor so as to impair the entire contract. *Id.* The court further noted the difference between cancellation and termination:

Cancelling is a right of a party that differs from the right to terminate and does not arise out of any termination provision in a contract. By cancelling

the contracts under the Uniform Commercial Code, Plaintiff never had to resort to the termination procedures of the contracts. So Defendants cannot make a claim as to unlawful termination.

*Id.* (footnotes omitted). In *Camfield*, the Eighth Circuit relied upon the decision in *Frigiking* and found that the manufacturer was justified in canceling its agreement with the dealer because the dealer was "chronically in debt to [the manufacturer] and substantially in breach of the dealership agreement." *Camfield*, 719 F.2d at 1366.

■ This court agrees with the *Frigiking* and *Camfield* decisions and finds BEI was justified in canceling the Distribution Agreement on April 3, 1996. In November 1995, just over a year after the parties entered into the Distribution Agreement, L & M owed BEI in excess of $430,000. The parties reached a payment agreement by which L & M agreed to make three lump sum payments to cover its past due amounts and to keep its account current from that point on (*i.e.*, by paying for items within 45 days of receiving them). After the parties worked out payment terms in November 1995, L & M continued to fall behind on its payments. By April 3, 1996, when BEI sent its notice of cancellation, it was clear L & M was unable to meet its financial obligations. If L & M had been fulfilling its obligations under the November 1995 payment arrangement, there would have been no need for its attorney to draft another payment agreement in early 1996. BEI made several attempts to save its relationship with L & M, but ultimately, justifiably canceled the Agreement. No reasonable person could conclude L & M did not breach the Distribution Agreement by failing to pay BEI in a timely manner.

Because the court has determined BEI's cancellation was appropriate, there is no need to address whether BEI had a right to terminate the agreement and whether 120 days was reasonable notice.

## IV. Tortious Interference Claims

■ "Kansas law recognizes that one who, without justification, induces or causes the breach of a contract to which it is not a party will be answerable for damages caused thereby." *Classic Communications v. Rural Tel. Serv.*, 956 F.Supp. 910, 921 (D.Kan.1997) (citing *Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106 (1986)). Under Kansas law, the elements of a claim for tortious interference with a contract include:

1. The existence of a contract between the plaintiff and a third party;

2. The defendant's knowledge thereof;

3. The defendant's intentional procurement of the contract's breach;

4. The absence of justification for procuring the breach; and

5. Damages resulting from the breach.

*See Brown Mackie College v. Graham*, 981 F.2d 1149, 1152 (10th Cir.1992); *Altrutech, Inc. v. Hooper Holmes, Inc.*, 6 F.Supp.2d 1269, 1276 (D.Kan.1998); *Bushnell Corp. v. ITT Corp.*, 973 F.Supp. 1276, 1288 (D.Kan. 1997); *Classic Communications*, 956 F.Supp. at 921; *DP-Tek, Inc. v. AT&T Global Info. Solutions*, 891 F.Supp. 1510, 1516 (D.Kan.1995).

■ Interference with a contract requires proof of breach of a contract between the plaintiff and a third party. *Bushnell Corp.*, 973 F.Supp. at 1288. "[A]n action for tortious interference with contract does not extend to claims of adverse impact or increased burden which fall short of inducing or causing actual breach." *Classic Communications*, 956 F.Supp. at 921.

■ To state a claim for tortious interference with a prospective business advantage, plaintiff must prove:

(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant,

plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct. *B & K Mechanical, Inc. v. Federal Ins. Co.*, 12 F.Supp.2d 1164, 1168–69 (D.Kan. 1998) (quoting *Reazin v. Blue Cross and Blue Shield of Kansas*, 899 F.2d 951, 977 (10th Cir.1990)); *Bushnell Corp.*, 973 F.Supp. at 1288; *Classic Communications*, 956 F.Supp. at 921.

Furthermore, [t]ortious interference with a prospective business relationship requires some type of communication between the defendant and the third party in which the defendant induces the third party not to engage in a prospective contract or business relation with the plaintiff. A plaintiff claiming improper influence must demonstrate that the defendant knew of prospective contractual relations but intentionally interfered with them without justification. *B & K Mechanical, Inc.*, 12 F.Supp.2d at 1169 (quoting *DP–Tek*, 891 F.Supp. at 1520). Not all interference in present or future contractual relations is tortious. "A person may be privileged or justified to interfere with contractual relations in certain situations." *Bushnell Corp.*, 973 F.Supp. at 1288.

■ "Both tortious interference with a contract and tortious interference with contractual expectations or a prospective business advantage are predicated on malicious conduct by the defendant." *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986); *see also Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 169, 872 P.2d 252 (1994) ("Tortious interference with a contract is predicated on malicious conduct by the defendant.") (citing *Turner*, 240 Kan. at 12, 722 P.2d 1106).

Although BEI admits L & M can establish the first two elements of its tortious interference with contract claim and the first three elements of its tortious interference with prospective business advantage claim, it argues L & M is unable to satisfy the remaining elements of its claims. As a result of its cancellation of the Distributor Agreement, BEI knows L & M lost its contract with Tesco,[5] but it contends it was never its plan or intent to procure the breach of those contracts. BEI claims its only concerns were whether L & M was going to pay its bills, and when it became evident L & M could not do so, it justifiably severed the relationship.

■ The court agrees that L & M is unable to satisfy the remaining elements of its tortious interference claims. Kansas law clearly provides that in this context, L & M must prove BEI acted maliciously. Here, there is absolutely no evidence of malicious intent by BEI. BEI did everything it might reasonably be expected to have done to preserve its arrangement with L & M. It worked with L & M to reduce L & M's large past-due account balance through a repayment agreement, an agreement L & M was unable to honor. BEI contacted L & M before selling parts to Tesco and indicated it would make up the difference on its sale to Tesco once L & M paid its balance. L & M failed to make payments when they were due, and therefore, BEI never paid the difference. Further, from his conversations with BEI representatives, Challoner understood L & M would continue to be BEI's distributor once matters were resolved. If BEI had acted maliciously, Challoner would hardly have had that impression. In addition, if BEI had not supplied the kits to Tesco, Tesco would have risked losing its government contract. Tesco faced an urgent situation, and BEI was able to fulfill its needs when L & M was unable to do so. No reasonable person could conclude that under the circumstances BEI acted with a

---

5. L & M's tortious interference with prospective business advantage claim apparently relates to BEI's alleged interference with L & M's prospective relationship with the Marine Corps.

malicious intent in its dealings with L & M and L & M's customers.

## V. Punitive Damages Claim

 "In diversity cases involving damages, the federal court must look to appropriate state law to ascertain the elements of the allowable damages." *Black v. Hieb's Enters., Inc.*, 805 F.2d 360, 365 (10th Cir.1986). In Kansas, "to warrant an award of punitive damages, a party must prove to the trier of fact by clear and convincing evidence that the party against whom the damages are sought acted with willful or wanton conduct, fraud, or malice." *Reeves v. Carlson*, 266 Kan. 310, 969 P.2d 252, 255 (1998) (citing Kan. Stat. Ann. § 60–3702(c)). Because the court has determined BEI justifiably canceled its contract with L & M and that L & M has failed to establish BEI acted maliciously in its contacts with third parties, there is no basis for L & M's claim for punitive damages.

IT IS THEREFORE ORDERED this 30th day of March, 1999, that BEI's motion for summary judgment (dkt. no. 28) is granted.